# EXHIBIT Q

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| IN RE: TAASERA LICENSING LLC, PATENT LITIGATION<br><br>THIS DOCUMENT RELATES TO CASE NO. 2:23-CV-00113-JRG | Case No. 2:22-md-03042-JRG |
| TAASERA LICENSING LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>PALO ALTO NETWORKS, INC.,<br><br>*Defendant*. | Case No. 2:23-cv-00113-JRG |

**DECLARATION OF JOHN R. BLACK, JR., PH.D.,**
**REGARDING CLAIM CONSTRUCTION**

## TABLE OF CONTENTS

**Page**

I. Introduction .......... 1

II. Background and Qualification .......... 1

III. Materials Considered .......... 4

IV. Legal Standards .......... 4

V. The ’356 Patent .......... 6

A. Overview of the ’356 Patent .......... 6

B. Claims .......... 8

C. Relevant Prosecution History .......... 12

VI. Level of Ordinary Skill in the Art .......... 14

VII. Claim Construction .......... 15

A. “[third/fourth] program instructions to determine if the packet is network administration traffic” / “network administration traffic” (claims 1, 9, 10, 13, 17) .......... 15

1. The term “program instructions” invokes means-plus-function treatment. .......... 15

2. The specification does not disclose corresponding structure for the term “[third/fourth] program instructions to determine if the packet is network administration traffic.” .......... 15

3. Plaintiff’s proposed construction is incorrect. .......... 20

VIII. Conclusion .......... 22

## CITED EXHIBITS

| Ex. No. | Brief Description |
|---|---|
| A | CV of Dr. John R. Black, Jr. |
| B | U.S. Patent No. 8,127,356 ("'356 patent") |
| C | '356 patent file history (excerpt), December 10, 2010, Decision on Appeal |
| D | '356 patent file history (excerpt), February 8, 2011, Request for Rehearing under Rule 41.52 |
| E | '356 patent file history (excerpt), March 3, 2011, Decision on Request for Rehearing |
| F | '356 patent file history (excerpt), May 2, 2011, Amendment |

I, John R. Black, Jr., declare as follows:

## I. Introduction

1. I have personal knowledge of all facts stated in this Declaration, and if called upon as a witness, I could and would competently testify thereto.

2. I have been retained by Defendant Palo Alto Networks, Inc. ("PAN"). I have been asked to address certain terms in U.S. Patent No. 8,127,356 (the "'356 patent," Exhibit B) based on my review of the evidence in this case. I offer no opinion any claim terms or patents that are not addressed in this Declaration.

3. This Declaration discusses my background and qualifications, the legal standards used in my analysis, an overview of the '356 patent from the perspective of a person of ordinary skill in the art as of the patent's alleged priority date (a "POSITA"), and my opinions regarding the patentability of the challenged claims.

4. My work in this proceeding is being charged to PAN at a standard rate of $735 per hour. My compensation is in no way contingent on the substance of my opinions or the outcome of this proceeding.

## II. Background and Qualification

5. A current copy of my CV is attached as Exhibit A.

6. I am an Associate Professor of Computer Science at the University of Colorado, Boulder. I received a B.S. in Mathematics and Computer Science from the California State University at Hayward (now "California State University, East Bay") in 1988. I received an M.S. in Computer Science in 1997 and a Ph.D. in Computer Science in 2000, both from the University of California at Davis.

7. I have taught more than 60 classes in computer science, on subjects including data structures, algorithms, networking, operating systems, software engineering, security,

cryptography, discrete mathematics, and quantum computing. I have authored or coauthored more than 20 publications, primarily on issues relating to computer security. I have been involved with computers for over 40 years in both commercial and academic capacities.

8. My earliest interest was in networks and security. My first memories in this regard were around 1975 when a group of friends and I learned about the telephone network and its security. A few years later, personal computers became available, and I spent most of my free time studying, programming, and modifying them. I worked extensively with various networking products throughout the 1980s and developed an interest in cryptography soon thereafter. Although my undergraduate institution had no courses in cryptography or security in the 1980s, I decided to pursue self-study at the time, and opted to double major in Computer Science and Mathematics because cryptography is a blend of these two subject areas.

9. After earning my B.S. degree in 1988, I worked for six years at Ingres Corp. as a software developer, writing and reviewing code written in C. My work primarily was directed at transaction logging, data type support, and security.

10. In 1995, I began my Ph.D. at UC Davis under cryptographer Phillip Rogaway. My area of focus was cryptography and security, and my research involved encryption, authentication, hash functions, and network security.

11. After graduation, I took a position as an Assistant Professor at the University of Nevada at Reno. In the Fall of 2001, I taught the networking class there, which included coverage of Ethernet, interior gateway protocols, exterior gateway protocols, ARP, DHCP/BOOTP, IP, UDP, TCP, HTTP, SMTP, and other protocols. In 2001, a graduate student and I looked at the security of ARP and invented a new protocol "AuthARP" to add security to the protocol.

12. In 2002, I moved to the University of Colorado at Boulder, where I am currently employed. In the Fall of 2002, I co-designed and co-taught a new course called "Foundations of Computer and Network Security," which included descriptions of security issues around both wired and wireless security challenges, mostly for public-facing network services, including the world-wide web. I have taught this class seven more times since then and have included modern topics such as wireless networking, the Internet of Things, and so forth. In particular, Network Intrusion Detection Systems (or "NIDS") are taught in this class; these systems are similar to the embodiments in the patent-at-issue here.

13. In my career at the University of Colorado, I have published several more papers in the area of cryptography and network security. I have taught more than 30 courses in network security and cryptography, and have graduated several Ph.D. students in these areas.

14. I also have worked for a consulting company at times, writing software on a contract basis. Although most projects are covered by NDAs, many involved networks and/or aspects of computer security.

15. In 2011, I began technical consulting for a local company called Cardinal Peak, which focuses primarily on video encoding and delivery systems. My work for Cardinal Peak has largely been directed to video encoding, transcoding, compression, encryption, and DRM, but also has included networking projects and embedded device work. For example, I designed the security system for the Pro1 smart thermostat, implemented the DRM for the Yonder Music App, worked on 802.1X code for smart dog collars, and helped design the cryptography used in Fitbit devices for wireless transfer of a Fitbit watch to a phone or laptop.

16. In 2016, I took a leave of absence from the University of Colorado to start a company named "SecureSet" in Denver, Colorado. The objective of SecureSet is to take

reasonably proficient technical people and turn them into computer and network security specialists via five months of intensive training. I designed the curriculum used at SecureSet, including system and network security much like the technology described in the patent-at-issue here. SecureSet was sold to WeWork in 2019 and continues to offer computer security classes today.

## III. Materials Considered

17. My analyses and opinions—from the perspective of a POSITA as of the priority date of ’356 patent—are based on my education, research, knowledge, and over 40 years of experience in the field of network security. In forming my opinions, I have reviewed the materials cited and referenced in this Declaration, including the ’356 patent, its file history, the parties’ claim construction disclosures and cited evidence.

## IV. Legal Standards

18. I am not a patent attorney and do not have any formal legal training. I have been informed by counsel regarding the applicable legal standards for claim construction. I have relied on these principles in forming my opinions.

19. I understand that claim construction is a matter of law and will be decided by the Court. I understand that the relevant inquiry in claim construction is the question of how a person of ordinary skill in the art would have understood the claim terms at the time of the invention, in the context of the particular claim in which it appears as well as in light of the patent specification, the prosecution history, and any other relevant intrinsic and extrinsic evidence. Intrinsic evidence includes the patent and its prosecution history. Extrinsic evidence is all evidence external to the patent and prosecution history, such as expert or inventor testimony or dictionaries.

20. I understand that the factors considered in determining the ordinary level of skill in the art include: (i) the levels of education and experience of persons working in the field; (ii) the types of problems encountered in the field; and (iii) the sophistication of the technology. I understand that a POSITA is not a specific real individual, but rather a hypothetical individual having the qualities reflected by the factors above.

21. I understand that a claim is invalid for indefiniteness if the claim, read in light of the specification and the prosecution history, fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

22. I understand there is a particular type of claim known as a means-plus-function claim. I understand that the means-plus-function analysis is a two-step process.

23. The first step is to determine whether a claim limitation is drafted in means-plus-function format. I have been informed that the parties here agree the claim term in question should be treated as a means-plus-function claim term, and accordingly I do not address this part of the legal standard.

24. In the second step, one must identify what structure, if any, is disclosed in the specification corresponding to the claimed function. A means-plus-function limitation is construed to cover only the disclosed structure and its equivalents. Structure disclosed in the specification is corresponding structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim. The structure disclosed in the specification must be adequate to achieve the claimed function. If a POSITA would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim, a means-plus-function clause is indefinite.

25. Under the second step, if the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm. If the only disclosed structure is a general purpose computer, but the specification fails to disclose an algorithm for performing the claimed function, the claim is invalid.

## V. The ’356 Patent

### A. Overview of the ’356 Patent

26. The ’356 patent is titled “System, Method and Program Product for Detecting Unknown Computer Attacks.” The ’356 patent generally relates to “determining if a packet is a new, exploit candidate.” ’356 patent, Abstract.

27. The Abstract teaches that in order to determine whether a packet is a new exploit candidate, the system applies a series of tests, such as “[f]irst program instructions [that] determine if the packet is a known exploit or portion thereof,” “[s]econd program instructions [that] determine if the packet is network broadcast traffic presumed to be harmless,” and “[t]hird program instructions [that] determine if the packet is network administration traffic.” *Id.* The precise number and combination of tests varies in the recited claims of the ’356 patent.

28. Based on the outcome of the multiple tests, the system either determines that the packet is or is not a new exploit candidate. *Id.* For example, the ’356 patent teaches that “program 30 determines if the packet contains a portion of a known exploit with a known signature. If so, program 30 stores the packet but ‘disregards’ it, i.e. does not consider it further as a new exploit candidate and will not send it to SOC 44 for further analysis (step 102).” *Id.*, 5:14-18.

29. Although there are multiple tests described and claimed in the '356 patent, this Declaration focuses primarily on the claim term "[third/fourth] program instructions to determine if the packet is network administration traffic."

30. With respect to network administration traffic, the '356 patent teaches that "program 30 determines if the packet is network administration traffic (decision 110)." *Id.*, 5:53-54. Program 30 is "honeypot packet filtering program 30 (FIG. 2) which reviews all packets received by the honeypot 12, and filters out those packets which are not portions of exploits (i.e. computer viruses, worms, exploitation programs, etc.), or which are portions of old exploits with known signatures." *Id.*, 4:56-60. The '356 patent does not provide any code for program 30, but merely states that "[p]rogram 30 is stored in disk storage device 36 for execution by one or more processors 31 via RAM 32." *Id.*, 5:8-10.

31. The patent then provides two examples of network administration traffic: "Examples of network administration traffic are secure shell ("SSH") traffic to remotely install a patch or change configuration or virtual network computing ("VNC") traffic or terminal services traffic to create a remote server desktop to remotely add a userID, or install a patch or change configuration (decision 110)." *Id.*, 5:54-59.

32. Figure 7 also describes testing for network administration traffic. The '356 patent teaches that "[s]ome or all bonafide network administrators are known to the administrator of intranet 14 by their combinations of IP protocol and respective IP address." *Id.*, 8:23-26. The system then determines a packet is network administration traffic by "compar[ing] the combination of IP protocol and IP address of the current packet to the combinations on the list 33." *Id.*, 8:31-33. This process is depicted in a flow chart in Figure 7 below:



FIG. 7

**B. Claims**

33. The asserted claims of the ’356 patent, with the relevant claim language bolded, are presented below:

> 1. A computer program product for automatically determining if a packet is a new, exploit candidate, the computer program product comprising:
>
> a computer-readable tangible storage device;
>
> first program instructions to determine if the packet is a known exploit;
>
> second program instructions to determine if the packet is addressed to a broadcast IP address of a network;
>
> **third program instructions to determine if the packet is network administration traffic;**
>
> fourth program instructions, responsive to the packet being a known exploit OR the packet being addressed to a broadcast IP address

of a network OR the packet being network administration traffic, to determine that the packet is not a new, exploit candidate; and

fifth program instructions, responsive to the packet not being a known exploit AND the packet not being addressed to a broadcast IP address of a network AND the packet not being network administration traffic AND the packet not being another type of traffic known to be benign, to determine and report that the packet is a new, exploit candidate; and wherein

the first, second, third, fourth and fifth program instructions are stored on the computer-readable tangible storage device.

9. A computer program product for automatically determining if a packet is a new, exploit candidate, the computer program product comprising:

a computer-readable tangible storage device;

first program instructions to determine if the packet is a known exploit;

second program instructions to determine if the packet is addressed to a broadcast IP address of a network;

**third program instructions to determine if the packet is network administration traffic;**

fourth program instructions, responsive to the packet being a known exploit OR the packet being addressed to a broadcast IP address of a network OR the packet being network administration traffic, to determine that the packet is not a new, exploit candidate; and

fifth program instructions, responsive to the packet not being a known exploit AND the packet not being addressed to a broadcast IP address of a network AND the packet not being network administration traffic AND the packet not being another type of traffic known to be benign, to determine and report that the packet is a new, exploit candidate; and wherein

the first, second, third, fourth and fifth program instructions are stored on the computer-readable tangible storage device;

the second program instructions also determine if the packet has a protocol listed in a list of protocols previously determined to be harmless network broadcast traffic;

the fourth program instructions are responsive to the packet being a known exploit OR the packet being addressed to a broadcast IP address of a network OR the packet being network administration traffic OR the packet having a protocol listed in a list of protocols previously determined to be harmless network broadcast traffic, to determine that the packet is not a new, exploit candidate; and

the fifth program instructions are responsive to the packet not being a known exploit AND the packet not being addressed to a broadcast IP address of a network AND the packet not being network administration traffic AND the packet not having a protocol listed in a list of protocols previously determined to be harmless network broadcast traffic, to determine and report that the packet is a new, exploit candidate.

10. A computer program product for automatically determining if a packet is a new, exploit candidate, the computer program product comprising:

a computer-readable tangible storage device;

first program instructions to determine if the packet is a known exploit;

second program instructions to determine if the packet is addressed to a broadcast IP address of a network;

**third program instructions to determine if the packet is network administration traffic;**

fourth program instructions, responsive to the packet being a known exploit OR the packet being addressed to a broadcast IP address of a network OR the packet being network administration traffic, to determine that the packet is not a new, exploit candidate; and

fifth program instructions, responsive to the packet not being a known exploit AND the packet not being addressed to a broadcast IP address of a network AND the packet not being network administration traffic AND the packet not being another type of traffic known to be benign, to determine and report that the packet is a new, exploit candidate; and wherein

the first, second, third, fourth and fifth program instructions are stored on the computer-readable tangible storage device; and

the third program instructions determine if the packet is network administration traffic by comparing an IP protocol and IP address of the packet to a list of combinations of IP protocols and IP addresses previously determined to be network administration traffic.

13. A computer program product for automatically determining if a packet is a new, exploit candidate, the computer program product comprising:

a computer-readable tangible storage device;

first program instructions to determine if the packet is a known exploit;

second program instructions to determine if the packet is addressed to a broadcast IP address of a network;

third program instructions to determine if the packet has a protocol listed in a list of protocols previously determined to be harmless broadcast traffic;

**fourth program instructions to determine if the packet is network administration traffic;**

fifth program instructions, responsive to the packet being a known exploit OR the packet being addressed to a broadcast IP address of a network OR the packet being network administration traffic OR the packet having a protocol listed in a list of protocols previously determined to be harmless broadcast traffic, to determine that the packet is not a new, exploit candidate; and

sixth program instructions, responsive to the packet not being a known exploit AND the packet not being addressed to a broadcast IP address of a network AND the packet not being network administration traffic AND the packet not having a protocol listed in a list of protocols previously determined to be harmless broadcast traffic, to determine and report that the packet is a new, exploit candidate; and wherein

the first, second, third, fourth, fifth and sixth program instructions are stored on the computer-readable tangible storage device.

> 17. A computer system for automatically determining if a packet is a new, exploit candidate, the computer system comprising:
>
> one or more processors, one or more computer-readable memories, one or more computer-readable tangible storage devices, and program instructions stored on at least one of the one or more storage devices for execution by at least one of the one or more processors via at least one of the one or more memories, the program instructions comprising:
>
> first program instructions to determine if the packet is a known exploit;
>
> second program instructions to determine if the packet is addressed to a broadcast IP address of a network;
>
> **third program instructions to determine if the packet is network administration traffic;**
>
> fourth program instructions, responsive to the packet being a known exploit OR the packet being addressed to a broadcast IP address of a network OR the packet being network administration traffic, to determine that the packet is not a new, exploit candidate; and
>
> fifth program instructions, responsive to the packet not being a known exploit AND the packet not being addressed to a broadcast IP address of a network AND the packet not being network administration traffic AND the packet not being another type of traffic known to be benign, to determine and report that the packet is a new, exploit candidate.

### C. Relevant Prosecution History

34. I have reviewed and considered the prosecution history of the '356 patent, relevant excerpts of which are attached hereto as Exhibits C-F. I provide a brief summary of certain relevant events during the prosecution of the '356 patent below.

35. In the December 10, 2010, Decision on Appeal (attached as Exhibit C), the Board of Patent Appeals and Interferences ("Board") addressed whether a certain prior art reference "Suuronen" disclosed the claim limitation "third program instructions to determine if said packet is network administration traffic." Ex. C at 10. The Board ruled as follows:

> We note that Appellants' attempt to distinguish the second and third program instructions over Suuronen based upon the nature of the information contained or stored in the claimed "packet" is unavailing. Appellants cannot rely solely upon the content or type of information stored in the claimed "packet" to patentably distinguish independent claim 1 over the prior art of record. The content or type of such information is nonfunctional descriptive material, which is not entitled to any patentable weight. *See In re Lowry,* 32 F.3d 1579, 1583 (Fed. Cir. 1994) ("Lowry does not claim merely the information content of a memory .... Nor does he seek to patent the content of information resident in a database."). *See also Ex parte Nehls,* 88 USPQ2d 1883, 1887-90 (BPAI 2008) (precedential); *Ex parte Curry,* 84 USPQ2d 1272, 1274-75 (BPAI 2005) (informative), aff'd, slip op. 06-1003 (Fed. Cir. June 2006) (Rule 36).

*Id.*

36. In a February 8, 2011, Request for Rehearing under Rule 41.52 (attached as Exhibit D), the Applicant challenged this ruling. Specifically, the Applicant argued as follows:

> Thus, claim 1 recites **program instructions** which make both determinations. Such program instructions are **algorithmic functions which perform the stated function**; such program instructions are not merely content or type of information. Therefore, the Board has misapprehended the meaning of the second and third program instructions, which are not merely content or type of information.

Ex. D at 4 (original emphasis).

37. The Board rejected these arguments in the March 3, 2011, Decision on Request for Rehearing (attached as Exhibit E). Specifically, the Board ruled:

> We find no merit in Appellants' second allegation of error that we misconstrued the second and third program instructions as mere statements of content or type of information. While we agree with Appellants that these program instructions are algorithmic functions, they merely serve the purpose of determining if a packet is network administration traffic, which is addressed to a network. In other words, these functions merely serve the purpose of determining the nature or type of a packet. We therefore reiterate our initial position that such a determination of the nature or type of the packet is directed to non-functional descriptive material, which is not entitled to any patentable weight.

Ex. E at 4.

38. After this ruling, the Applicant submitted a Request for Continued Examination with an Amendment (attached as Exhibit F), in which it amended the claimed "fifth program instructions" term and argued that this amendment overcame the prior art. Ex. F at 17-18.

39. The Applicant did *not* substantively amend the claim term "third program instructions to determine if said packet is network administration traffic." *See* Ex. F at 6 (only amendment was changing "**said** packet" to "**the** packet"). The Applicant did repeat its argument that "Suuronen et al. fail to disclose the second and third program instructions of claim 1 which determine if the packet is addressed to a broadcast IP address of a network or network administrative traffic," but without any explanation. *See id.* at 19. Applicant did not address the basis of the Board's decision ("a determination of the nature or type of the packet is directed to non-functional descriptive material, which is not entitled to any patentable weight," Ex. E at 4).

40. After further prosecution, the examiner eventually allowed the claims. The examiner did not provide any reasons for allowance.

## VI. Level of Ordinary Skill in the Art

41. The '356 patent was filed August 27, 2003 and does not claim priority to any other patent or application. I have been informed that Taasera has identified August 27, 2003 as the priority date for the claims of the '356 patent in its infringement contentions. I have been instructed to apply Taasera's proposed priority date of August 27, 2003 in my analysis. I have not analyzed that date myself and do not offer any opinions regarding the proper priority date at this time.

42. Based on the factors in the legal standard provided by counsel, my knowledge and expertise, and the '356 patent, it is my opinion that a POSITA at the time of the relevant priority date would have had a bachelor's degree in computer science, computer engineering, or

electrical engineering and at least three years of experience in networking operating systems and cyber security, or a master's degree in one of the foregoing and at least two years of experience in the aforementioned fields. Someone with less or different technical education but more relevant practical experience, or more relevant education but less practical experience, could also be considered a POSITA.

43. I meet this definition of a POSITA today and met this definition by August 27, 2003.

## VII. Claim Construction

### A. "[third/fourth] program instructions to determine if the packet is network administration traffic" / "network administration traffic" (claims 1, 9, 10, 13, 17)

#### 1. The term "program instructions" invokes means-plus-function treatment.

44. I have been informed that both parties have agreed this claim term is subject to means-plus-function treatment and that the function is "determine if the packet is network administration traffic." I have been instructed to therefore treat the claim term "[third/fourth] program instructions to determine if the packet is network administration traffic" as being a means-plus-function claim term with the function of "determine if the packet is network administration traffic."

#### 2. The specification does not disclose corresponding structure for the term "[third/fourth] program instructions to determine if the packet is network administration traffic."

45. As I explained above, the parties agree that the function for this claim term is "determine if the packet is network administration traffic."

46. The specification is clear that the invention operates on a computer. *See, e.g.*, '356 patent at 4:16-35 (describing "a computer system generally designated 10" which includes

"[h]oneypot computer 12"). Additionally, as noted above in my review of the prosecution history, the Applicant and Board both agreed during prosecution that this claim term referred to "algorithmic functions." Ex. D at 4 (Applicant arguing "claim 1 recites program instructions … Such program instructions are algorithmic functions which perform the stated function"); Ex. E at 4 (Board ruling that "we agree with Appellants that these program instructions are algorithmic functions"). Thus, the specification must disclose a corresponding algorithm for the recited function.

47. The specification does not disclose an algorithm to "determine if the packet is network administration traffic" for at least two reasons. First, Figure 7 (which Plaintiff relies on), to the extent it sufficiently discloses an algorithm at all, does not disclose an algorithm *adequate* to perform the entire recited claim function. Figure 7, at most, teaches how to identify administrators but not network administration traffic generally and not either of the two specific examples of network administration traffic disclosed in the specification. Thus, Figure 7 fails to disclose an adequate algorithm. Second, the term "network administration traffic" itself fails to inform, with reasonable certainty, a POSITA about the scope of this claim term, and so the specification fails to disclose an algorithm adequate to perform this function.

48. First, the specification fails to disclose an algorithm adequate to perform the function of identifying network administration traffic generally, and specifically fails to disclose an algorithm for identifying the two specific examples of network administration traffic taught in the specification. The first two examples of network administration traffic in the specification are: "secure shell ('SSH') traffic to remotely install a patch or change configuration or virtual network computing ('VNC') traffic or terminal services traffic to create a remote server desktop to remotely add a userID, or install a patch or change configuration (decision 110)." '356 patent

at 5:54-59. Even if there were a way to get around the Board's ruling that determining the "nature or type of the packet is directed to non-functional descriptive material, which is not entitled to any patentable weight" (Ex. E at 4), the specification does not disclose any algorithm for determining that a packet meets either of these examples of network administration traffic. Both SSH and VNC are known protocols that can perform additional functions beyond those listed in the specification. For example, an administrator might issue firewall configuration commands via iptables, but then—via the same SSH session—also check her personal email. The firewall commands may be considered "network administration" but checking the administrator's personal email is not "network administration." Thus, the mere use of a protocol like SSH does not indicate that associated traffic is or is not "network administration traffic," and the specification fails to provide any algorithm for distinguishing between SSH or VNC traffic that is network administration traffic vs. SSH or VNC traffic that is not network administration traffic.

49. The only other substantive discussion of "network administration traffic" in the specification (at 8:21-37, describing Figure 7) describes how to identify administrators by a combination of IP protocol and IP address. Even assuming this were a sufficient algorithm for identifying administrat***ors***, it is not a sufficient algorithm for performing the full scope of the claim, which is identifying "network administrat***ion*** traffic." The full claim term is indisputably broader than the limited example relating to Figure 7, at least because it must include the other examples of network administration traffic included in the specification (such as the specific SSH or VNC traffic discussed above). The algorithm relating to Figure 7 and described at 8:21-37 does not even describe how to identify SSH or VNC traffic generally—the "IP protocol" and "IP address" described in Figure 7 and the related text would not identify SSH or VNC traffic,

because SSH and VNC of traffic can be delivered over multiple IP protocols (such as TCP or UDP) and from multiple IP addresses. Furthermore, Figure 7 and the related text certainly does not describe how to identify the function of SSH or VNC traffic to determine if it is the specific type of SSH or VNC traffic that the patent teaches is network administration traffic.

50. I have reviewed the intrinsic evidence support identified by Plaintiff, which is Figure 2, Figure 7, 3:16-23, 5:49-6:32[1], and 8:21-37. I addressed 5:49-6:32, 8:21-37, and Figure 7 above. The only relevant part of Figure 2 is a single diamond 110 labeled "Administration Traffic?" with yes and no branches. This does not describe any algorithm, but merely repeats the agreed function. The discussion at 3:16-23 simply repeats the claim language (along with the language of subsequent claim limitations), but does not disclose any algorithm.

51. Thus, the specification fails to disclose an algorithm *adequate* to perform the agreed function of "determine if the packet is network administration traffic" at least because the specification does not disclose any algorithm for identifying either of the two specific examples of network administration traffic taught in the specification.

52. Second, the phrase "network administration traffic" itself fails to inform, with reasonable certainty, a POSITA about the scope of this claim term. Thus, the specification fails to disclose any algorithm adequate to perform the undefined scope of this function.

53. "Network administration traffic" is not a standard, well-defined term in computing. Instead, it could refer to any number of things, such as LLDP, STP, BGP, SNMP[2].

---

[1] My discussion above focused on the teaching of example network administration traffic at 5:54-59. This section also contains additional teachings about what happens after the network administration traffic is detected or what happens if web crawler traffic is detected, which are relevant to other claim limitations but do not provide any algorithm for the disputed claim term.

[2] These are examples from a large set of protocols that work at a low level in the network: LLDP (Local Link Discovery Protocol) allows network devices to discover neighbors on the

As the patent suggests, even generic protocols like SSH ***may*** carry commands from a network administrator, but simply because a command is issued by a network administrator does not mean it is "network administration traffic," such as the example of an administrator checking her personal email via SSH that I discussed above. Therefore the mere use of a protocol like SSH does not indicate that associated traffic is or is not related to "network administration."

54. The specification provides no clarity on the above problem: the specification provides no definition of "network administration traffic," but instead only a few, significantly different examples with no explanation of how or why a POSITA would tie these different examples together. For example, the specification identifies "[e]xamples of network administration traffic" as including "secure shell ('SSH') traffic to remotely install a patch or change configuration or virtual network computing ('VNC') traffic or terminal services traffic to create a remote server desktop to remotely add a userID, or install a patch or change configuration (decision 110)." '356 patent at 5:54-59. Thus, in this example, network administration traffic apparently relates to the *content* of the message and what task it is performing on the network (notwithstanding the Board's decision during prosecution that determining the "nature or type of the packet is directed to non-functional descriptive material, which is not entitled to any patentable weight," Ex. E at 4).

55. Later, the specification provides a completely different example in which determining network administration traffic refers to storing a list of known "IP protocol and respective IP address" that refer to known administrators. '356 patent at 8:21-29. This example turns not on the content of the message, but on characteristics of the message being used to

---

network, STP (Spanning Tree Protocol) helps avoid loops in a LAN, BGP (Border Gateway Protocol) helps build routing tables, and SNMP (Simple Network Management Protocol) helps collect statistics from various network devices.

identify a person/account as an administrator. And, as I explained above, a POSITA could not determine that traffic is the specific SSH or VNC traffic recited in the specification based on "IP protocol" and "IP address."

56. Thus, in my opinion, the term "network administration traffic" fails to inform, with reasonable certainty, a POSITA about the scope of this claim term. Accordingly, because part of the function lacks a reasonably ascertainable meaning, the specification fails to disclose any algorithm for performing that function.

57. Thus, in my opinion, the specification fails to disclose an algorithm sufficient to perform the recited function of "determine if the packet is network administration traffic" for at least the two reasons I describe above.

**3. Plaintiff's proposed construction is incorrect.**

58. I understand that Plaintiff has proposed the term "network administration traffic" should be construed as "traffic generated by harmless network administration activities." I disagree that a POSITA would consider this to be a proper construction and, in fact, this construction is inconsistent with the '356 patent.

59. First, including the word "harmless" in the construction makes the scope of the construction lack reasonable certainty to a POSITA. A POSITA, at the time of the invention would not know how to identify which network administration traffic is harmless vs. which network administration traffic is not harmless. This uncertainty would further support the reasons I identified above that a POSITA would conclude the specification does not disclose an algorithm for performing the recited claim function. In particular, using Plaintiff's proposed construction, the specification fails to disclose any algorithm for identifying traffic generated by "harmless" activities (as opposed to, for example, harmful activities). Thus, under Plaintiff's

proposed construction, a POSITA would still conclude that the specification does not disclose an algorithm for performing the recited claim function.

60. Second, the '356 patent is clear that network administration is merely "presumed to be harmless" ('356 patent at 5:59-61, 8:21-23). Thus, including "harmless" in the construction is inconsistent with the patent, because the patent does not teach identifying the subset of "harmless" network administration traffic, but instead identifying all (the entire set of) network administration traffic and then presuming it all to be harmless. Accordingly, a POSITA would conclude that the specification does not disclose an algorithm for performing the recited claim function with Plaintiff's proposed construction, because there is no disclosure of identifying only harmless network administration traffic.

61. Third, Plaintiff's construction is inconsistent with the Board's ruling during prosecution that determining the "nature or type of the packet is directed to non-functional descriptive material, which is not entitled to any patentable weight." Ex. E at 4. Plaintiff's proposed construction appears to turn on the nature or type of the packet, i.e. that it is generated by "harmless network administration activities."

62. Finally, I observe that Plaintiff's proposed construction is inconsistent with the specification's teaching of identifying administrat***ors*** by a combination of IP protocol and address. *See* '356 patent at 8:21-37, Fig. 7. Network administrators may sometimes perform network administration activities, but they also perform other activities on the network (e.g. checking their own email). The teaching at 8:21-37 and in Figure 7 would detect those network administrators by IP protocol and IP address regardless of whether they were performing "harmless network administration activities" or any other function, and thus Plaintiff's proposed construction is inconsistent with this example in the specification.

## VIII. Conclusion

63. I reserve the right to supplement or amend my opinions in light of any additional evidence, testimony, discovery, or other information that may be provided to me after the date of this Declaration. In addition, I reserve the right to consider and testify about issues that may be raised by Plaintiff's fact witnesses and/or experts at any hearing or in any expert reports. I also reserve the right to modify or to supplement my opinions as a result of ongoing fact and expert discovery or testimony at trial.

64. I further reserve the right to present any tutorials regarding the background technology and terminology in connection with the opinions in this Declaration, any supplemental declarations, and/or expert reports that I may prepare in this case. I reserve the right to use demonstrative exhibits and/or refer to publicly available information, including any technical publications such as books and articles, to aid my testimony and, accordingly, reserve the right to prepare exhibits and demonstrative evidence for any hearing pursuant to the schedule set by the Court.

65. I expressly reserve the right to amend or supplement my opinions in this case when additional information is made available to me.

66. This Declaration is based on my personal knowledge, and if called as a witness, I would and could competently testify regarding the facts stated herein.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Date: July 13, 2023

John R. Black, Jr., Ph.D.