# EXHIBIT R

harborlabs™

Harbor Labs, LLC
Baltimore, MD
1-855-CYBR-SCI
HarborLabs.com

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| **IN RE: TAASERA LICENSING LLC, PATENT LITIGATION**<br><br>**THIS DOCUMENT RELATES TO ALL CASES** | **CIVIL ACTION NO. 2:22-MD-03042-JRG** |

**DECLARATION OF DR. AVIEL D. RUBIN WITH REGARD TO CERTAIN CLAIM TERMS OF U.S. PATENT NOS. 8,990,948, 9,092,616 AND 9,071,518**

# Table of Contents


Introduction ........ 1

My Background and Qualifications ........ 2

Compensation ........ 6

Materials Reviewed ........ 6

Priority Date of the Asserted Claims of the ’948 Patent, the ’616 Patent, and the ’518 Patent ..... 7

I. Priority Date of the Asserted Claims of the ’948 Patent and the ’616 Patent ........ 7

II. Priority Date of the Asserted Claims of the ’518 Patent ........ 8

Person of Ordinary Skill in the Art (POSITA) ........ 8

Legal Standards ........ 10

Detailed Analysis of the Specific Questions of Fact on Which I Have Been Asked to Provide My Opinions ........ 12

I. Summary of the Specific Questions of Fact on Which I Have Been Asked to Provide My Opinions ........ 12

II. U.S. Pat. No. 8,990,948 ........ 13

A. Summary of My Opinions on Specific Questions of Fact for the Asserted Claims of the ’948 Patent ........ 14

B. An Integrity Processor ........ 14

C. A Trust Supervisor ........ 18

III. U.S. Pat. No. 9,092,616 ........ 21

A. Summary of My Opinions on Specific Questions of Fact for the Asserted Claims of the ’616 Patent ........ 22

B. A Network Trust Agent ........ 22

IV. U.S. Patent No. 9,071,518 ........ 26

A. Summary of My Opinions on Specific Questions of Fact for the Asserted Claims of the ’518 Patent ........ 26

B. Substantially Real Time ........ 27

CONCLUSION ........ 29

I, Dr. Aviel D. Rubin, hereby declare and state as follows:

**Introduction**

1. My name is Dr. Aviel D. Rubin. I am over the age of eighteen (18) and am competent to make this Declaration. I have personal knowledge of the matters set forth herein.

2. I have been informed that Taasera Licensing LLC ("Taasera" or "Plaintiff") has asserted, in separate district court cases that have been consolidated for pre-trial purposes as a Multidistrict Litigation ("MDL") in the United States District Court for the Eastern District of Texas, that Check Point Software Technologies Ltd. ("Check Point"), Trend Micro (Japan) Inc. ("Trend Micro"), Fortinet, Inc. ("Fortinet"), Musarubra US LLC, d/b/a Trellix ("Trellix"), and Palo Alto Networks Inc. ("PAN") (collectively "Defendants") infringe certain claims of, among other patents, U.S. Patent Nos. 8,990,948 (the "'948 Patent"), 9,092,616 (the "'616 Patent"), and 9,071,518 (the "'518 Patent").[1] In this Declaration, I collectively refer to the '948 Patent, the '616 Patent, and the '518 Patent as the "Asserted Patents."

3. I have been asked by the Defendants to provide my expert opinions regarding certain questions of fact relating to certain terms appearing in the Asserted Claims of the Asserted Patents. I am being compensated for my work on this matter at my standard hourly consulting rate of $925 plus reimbursement for expenses. My compensation is in no way dependent upon or tied to the opinions I offer or the testimony I provide.

[1] I have been informed that Plaintiff asserts claims 1-5 of the '948 Patent against Check Point, Trend Micro, Fortinet and Trellix; claims 1-3 and 5 of the '948 Patent against PAN; claims 1-7 of the '616 Patent against Check Point, Trend Micro, Fortinet and Trellix; claims 1-6 of the '616 Patent against PAN; claims 1, 6-8, 10, 12-15, 17, 20, and 22 of the '518 Patent against Check Point; and claims 1, 6, 8, 10, 14, 15, 17 and 22 of the '518 Patent against Trellix. In this Declaration, I collectively refer to these asserted claims against the Defendants as the "Asserted Claims."

4. My opinions are set forth in this Declaration and are based on my general knowledge and experience, as well as the materials identified herein (including those listed below in the Materials Reviewed Section (*infra* ¶ 23). If called upon to do so, I could and would competently testify thereto.

**<u>My Background and Qualifications</u>**

5. I believe that I possess the knowledge, skills, experience, training, and education to form expert opinions and give testimony in this matter. I have over thirty (30) years of experience in the field of computer science, and specifically in Internet and computer security. I received my Ph.D. in Computer Science and Engineering from the University of Michigan, Ann Arbor in 1994, with a specialty in computer security and cryptographic protocols. My thesis was entitled "Nonmonotonic Cryptographic Protocols" and concerned authentication in long-running networking operations.[2]

6. I will discuss my current position as a professor first, followed by a synopsis of my career and work from the time I received my Ph.D. to the present.

7. I am currently employed as Professor of Computer Science at Johns Hopkins University (the "University"), where I perform research, teach graduate and undergraduate courses in computer science and related subjects, advise undergraduate and Masters students, and supervise the research of Ph.D. candidates and other students. I have taught courses including Networking, Security and Privacy in Computing, and Advanced Topics in Computer Security. I am also Technical Director of the Johns Hopkins University Information Security Institute – the University's focal point for research and education in information security, assurance, and

[2] Aviel D. Rubin, Ph.D. dissertation: *Nonmonotonic Cryptographic Protocols*, University of Michigan, Ann Arbor (April, 1994).

privacy. The University, through the Information Security Institute's leadership, has been designated a Center of Academic Excellence in Information Assurance by the National Security Agency and leading experts in the field.

8. I interned at The International Business Machines Corporation ("IBM") in 1989. During my time there, I worked on the IBM System/360 family of mainframe computer systems.

9. After receiving my Ph.D., I began working at Bellcore in its Cryptography and Network Security Research Group from 1994 to 1996. During that period, I focused my work on Internet and Computer Security.

10. From 1995 through 1999, in addition to my commercial work, I served as Adjunct Professor at New York University, where I taught undergraduate classes on computer, network, and Internet security issues.

11. In 1997, I moved to AT&T Labs, Secure Systems Research Department, where I continued to focus on Internet and computer security. I stayed at AT&T until 2003, when I left to accept a full-time academic position at the University. The University promoted me to full professor with tenure in April 2004.

12. I serve, or have served, on several technical and editorial advisory boards. For example, I served on the Editorial and Advisory Board for the International Journal of Information and Computer Security. I also served on the Editorial Board for the Journal of Privacy Technology. In addition, I have been Associate Editor of the Institute of Electrical and Electronics Engineers' ("IEEE") Security and Privacy Magazine and served as Associate Editor of the Association for Computing Machinery's ("ACM") Transactions on Internet Technology. I also served as Associate Editor of the journal Communications of the ACM, and I was an Advisory Board Member of Springer's Information Security and Cryptography Book Series. I

also have served in the past as a member of the Defense Advanced Research Projects Agency's Information Science and Technology Study Group, a member of the Government Infosec Science and Technology Study Group of Malicious Code, a member of the AT&T Intellectual Property Review Team, Associate Editor of the Electronic Commerce Research Journal, Co-editor of the Electronic Newsletter of the IEEE Technical Committee on Security and Privacy, a member of the board of directors of the USENIX Association (the leading academic computing systems society), and a member of the editorial board of the Bellcore Security Update Newsletter.

13. I have spoken on information security and electronic privacy issues at more than fifty (50) seminars and symposia. For example, I presented keynote addresses on the topics "Security of Electronic Voting" at Computer Security 2004 Mexico in Mexico City, Mexico, in May 2004; "Electronic Voting" to the Secure Trusted Systems Consortium 5th Annual Symposium in Washington, D.C., in December 2003; "Security Problems on the Web" to the AT&T EUA Customer conference in March 2000; and "Security on the Internet" to the AT&T Security Workshop in June 1997. I also presented a talk about hacking devices at the TEDx conference in October 2011 and another TEDx talk on the same topic in September 2015.

14. From 2005 to 2011, I served as Founder and President of Independent Security Evaluators ("ISE"), a computer security consulting firm. In that capacity, I guided ISE through the qualification process to become an independent testing laboratory for Consumer Union, which produces the Consumer Reports magazine. As an independent testing laboratory for Consumer Union, I managed an annual project where we tested popular anti-virus products. Our results were published in Consumer Reports each year for three consecutive years.

15. I am currently the Founder and Chief Scientist of Harbor Labs, a software and networking consulting firm specializing in medical device security and privacy of healthcare data.

16. Virtually my entire professional career has been dedicated to issues relating to software, networks, and computer systems more generally.

17. I am a named inventor of ten (10) United States patents. The patent numbers and titles as well as my co-inventors are listed on the attached curriculum vitae in Exhibit 1.

18. In March 2004, I was asked by the Federal Trade Commission ("FTC”) to submit a report commenting on the viability and usefulness of a national Do Not E-mail Registry. I submitted my report entitled “A Report to the Federal Trade Commission on Responses to Their Request for Information on Establishing a National Do Not E-mail Registry” on May 10, 2004.[3]

19. I have also testified before Congress regarding security issues with electronic voting machines, as well as in the United States Senate on the issue of censorship. Further, on November 19, 2013, I testified before Congress about security issues related to the government’s Healthcare.gov web site. It was my opinion that Healthcare.gov did not incorporate adequate security measures and that its poor architectural design allowed for potential compromises of private enrollment information. I recommended several approaches for securing Healthcare.gov, one of which included a recurring security review to check for vulnerabilities such as structured query language (“SQL”) injections.

20. I am the author or co-author of five (5) books regarding information security issues: Brave New Ballot, Random House, 2006; Firewalls and Internet Security (Second

[3] Rubin, Aviel D. “A Report to the Federal Trade Commission on Reponses to their Request For Information on Establishing a National Do Not E-mail Registry.” (2004).

Edition), Addison Wesley, 2003; White-Hat Security Arsenal, Addison Wesley, 2001; Peer-to-Peer, O'Reilly, 2001; and Web Security Sourcebook, John Wiley & Sons, 1997. I am also the author of numerous journal and conference publications.

21. Additional details of my education and employment history, recent professional service, patents, publications, and other testimony are set forth in my current *curriculum vitae* in Exhibit 1 of this Declaration.

**Compensation**

22. I am being compensated for my work on this matter at my standard hourly consulting rate of $925 plus reimbursement for expenses. My compensation is in no way dependent upon or tied to the opinions I offer or the testimony I provide.

**Materials Reviewed**

23. In preparing this Declaration, I have considered the following materials:

- The '948 Patent;
- The prosecution history of the '948 Patent;
- The '616 Patent;
- The prosecution history of the '616 Patent; and
- U.S. Provisional Patent Application No. 61/641,007, filed on May 1, 2012 (the "'007 Provisional"), to which the '948 Patent and the '616 Patent each claim priority (*see* '948 Patent at p. 1; '616 Patent at p. 1).
- The '518 Patent;
- The prosecution history of the '518 Patent; and
- U.S. Provisional Patent Application No. 61/503,729 (the "'729 Provisional"), filed on July 1, 2011 (the "'729 Provisional"), to which the '518 Patent claims priority (*see* '518 Patent at p. 1).

## Priority Date of the Asserted Claims[4] of the ’948 Patent, the ’616 Patent, and the ’518 Patent

### I. Priority Date of the Asserted Claims of the ’948 Patent and the ’616 Patent

24. Both the ’948 Patent and the ’616 Patent were filed on July 27, 2012 and each patent claims priority to, and incorporates by reference in its entirety, U.S. Provisional Patent Application No. 61/641,007, (the “’007 Provisional”), which was filed on May 1, 2012. ’948 Patent at p. 1, 1:8-11; ’616 Patent at p. 1, 1:7-10.

25. Based on my review of the ’948 Patent and the ’616 Patent, I understand that, with the exception of differences in the claims, in the Abstract, and within various sentences in the Detailed Description[5], the ’948 Patent and the ’616 Patent share a common, identical specification (including Figures and Disclosure) with each other.

26. I have been informed and understand that the Plaintiff contends that each of the asserted claims of the ’948 Patent and the ’616 Patent[6] is entitled to a priority date of May 1, 2012, which is the filing date of the ’007 Provisional. Thus, in forming my opinions, I considered the level of knowledge, skill, creativity, and common terminology used by persons of

---

[4] *See* footnote 1 of my Declaration above (in which I list what I understand to be the respective claims of the ’948, ’616, and ’518 Patents that Taasera asserts against various Defendants).

[5] I have attached as Exhibit 2 hereto a document received from Defendants’ counsel, which I am informed and understand is a comparison of the text of the ’616 Patent specification (Abstract, Disclosure, Claims) to the text of the ’948 Patent specification (Abstract, Disclosure, Claims), with additions shown in blue and deletions shown in red, that was generated using the Litera® Change-Pro for Word software program. Based on my own review, I have confirmed that Exhibit 2 appears to accurately identify differences between the ’616 Patent specification and the ’948 Patent specification, which appear in the Abstract (’616 Patent p. 1 vs. 948 Patent p. 1); within various sentences in the Detailed Description (10:60 (of the ’616 and ’948 Patents); ’616 Patent 13:15 vs. ’948 Patent 13:12-13; ’616 Patent 18:18-20 vs. ’948 Patent 18:14; ’616 Patent 19:23 vs. ’948 Patent 19:13; ’616 Patent 25:21-25 vs. ’948 Patent 25:15-17; ’616 Patent 25:37-43 vs. ’948 Patent 25:29-33; ’616 Patent 33:11-21 vs. ’948 Patent 32:65-33:5; ’616 Patent 33:35-38 vs. ’948 Patent 33:18-19; ’616 Patent 34:48-49 vs. ’948 Patent 34:30-31); and in the claims (’616 Patent 39:53-43:16 vs. ’948 Patent 39:32-40:40).

[6] *See* footnote 1 of my Declaration above (in which I list what I understand to be the respective claims of the ’948 and ’616 Patents that Taasera asserts against various Defendants).

ordinary skill in the art (abbreviated herein as "POSITA") as of the Plaintiff's contended time of the invention (i.e., May 2012). *See infra* ¶¶ 30-32. My opinions contained in this Declaration do not change regardless of whether the invention date of the asserted claims of the '948 Patent and the '616 Patent is July 27, 2012 (the filing date of the '948 Patent and the '616 Patent) or May 1, 2012 (the filing date of the '007 Provisional).

## II. <u>Priority Date of the Asserted Claims of the '518 Patent</u>

27. The '518 Patent was filed on July 2, 2012 and it claims priority to, and incorporates by reference in its entirety, U.S. Provisional Patent Application No. 61/503,729 (the "'729 Provisional"), which was filed on July 1, 2011. '518 Patent at p. 1, 1:7-11.

28. I have been informed and understand that the Plaintiff contends that each of the asserted claims of the '518 Patent[7] is entitled to a priority date of July 1, 2011, which is the filing date of the '729 Provisional. Thus, in forming my opinions, I considered the level of knowledge, skill, creativity, and common terminology used by persons of ordinary skill in the art (abbreviated herein as "POSITA") as of the Plaintiff's contended time of the invention (i.e., July 2011). *See infra* ¶¶ 30-32. My opinions contained in this Declaration do not change regardless of whether the invention date of the Asserted Claims of the '518 Patent is July 2, 2012 (the filing date of the '518 Patent) or July 1, 2011 (the filing date of the '729 Provisional).

## <u>Person of Ordinary Skill in the Art (POSITA)</u>

29. I have been instructed by Defendants' counsel that terms in a patent's claims must be read as they would have been understood by a person of ordinary skill in the art ("POSITA") at the time of the invention.

[7] *See* footnote 1 of my Declaration above (in which I list what I understand to be the claims of the '518 Patent that Taasera asserts against Check Point and Trellix respectively).

30. I have also been instructed by Defendants' counsel that a POSITA is a hypothetical person to whom the claimed subject matter pertains with the capability of understanding the scientific and engineering principles applicable to the pertinent art. I have further been instructed by Defendants' counsel that the following factors may be considered in determining the level of ordinary skill; type of problems encountered in the art; prior art solutions to those problems; speed with which innovations are made; sophistication of the technology; and educational level of active workers in the field. I have also been instructed by Defendants' counsel that not every factor may be present and that one or more factors may predominate.

31. In my opinion, a POSITA, at the respective time of the invention of the '948 Patent and of the '616 Patent (May 2012), and of the '518 Patent (July 2011),[8] would have been a person with at least a bachelor's degree in computer science or in a related field (*e.g.*, computer engineering, electrical engineering, etc.), or an equivalent technical degree or equivalent work experience, and at least an additional one to two years of education or experience in computer security (*e.g.*, computer network security, computer network application security, etc.). In my opinion, someone with less or different technical education but more relevant practical experience, or more relevant education but less practical experience, could also be considered a POSITA. For example, in my opinion, a person with a bachelor's degree in electrical engineering, and three years of experience in computer network security and computer network application security, at the respective time of the invention of the '948 Patent and of the '616 Patent (May 2012), and of the '518 Patent (July 2011),[9] could also be considered a POSITA.

---

[8] As currently contended by Plaintiff. *See supra* ¶¶ 26 and 28.
[9] *See supra* footnote 8.

32. I have applied this definition of a POSITA as of July 2011 (for the ’518 Patent), and as of May 2012 (for the ’948 Patent and the ’616 Patent), in rendering my opinions. *See also supra* ¶¶ 26, 28 (in which I note that my opinions contained in this Declaration do not change if the “time of the invention” of the ’948 Patent and of the ’616 Patent is July 27, 2012 (the filing date of the ’948 Patent and the ’616 Patent) or if the “time of the invention” of the ’518 Patent is July 2, 2012 (the filing date of the ’518 Patent)).

**Legal Standards**

33. I have a working knowledge of patent law based on my consulting work in patent cases, as well as from obtaining my own patents as an inventor. However, I am not an attorney and have not been asked to offer my opinion on the law. Moreover, I have been instructed on certain legal principles by Defendants’ counsel that pertain to the opinions I offer herein for this matter. In general terms, I provide my understanding of these legal principles below as conveyed and/or confirmed to me by counsel.

34. I have been instructed by Defendants’ counsel that the claims of a patent define the limits of the patentees’ exclusive rights. In order to determine the scope of the claimed invention, Courts typically construe (or define) claim terms, the meaning of which the parties may dispute. I have been instructed that claim terms should generally be given their ordinary and customary meaning as understood by a POSITA at the time of the invention and after reading the claims, the patent’s specification, and the prosecution history of the patent.

35. I have been instructed that patent claims must be construed in light of and consistent with the patent’s “intrinsic evidence.” I have been instructed that “intrinsic evidence” includes the claims themselves, the written disclosure in the specification, the patent’s prosecution history, including the prior art that was considered by the United States Patent and

Trademark Office ("USPTO"), and the claims and prosecution history of related patents including patents that share the same specification as the patent-at-issue. I have been instructed that "extrinsic evidence" may also be considered when construing claims and that such "extrinsic evidence" may include, for example, technical dictionaries, treatises, and expert testimony.

36. I have been instructed that, typically, the claims themselves provide substantial guidance as to the meaning of particular claim terms. However, I have also been instructed that claims must be read in view of the specification, of which they are a part. And, I have been instructed that, although claim language generally takes its ordinary meaning, the question is not whether there is a settled ordinary meaning of the claim terms in some abstract sense of the words. Rather, the only meaning that matters in claim construction is the meaning in the context of the patent.

37. I have been instructed that a patent claim, when read in view of the specification and the prosecution history, is required to inform a POSITA about the scope of the invention with reasonable certainty. I have been instructed that this requirement of a patent claim is called "definiteness". I have also been instructed that a patent claim does not satisfy the "definiteness" requirement merely because a POSITA can ascribe some meaning to the claim. Rather, the claim, when read in view of the specification and the prosecution history, must provide objective boundaries for the invention to a POSITA to thereby apprise the public of what is still open to them. I have further been instructed that, therefore, important inquiries related to the "definiteness" requirement include whether a claim limitation, in view of the claims, specification, and prosecution history, might mean several different things to a POSITA, and, if so, whether an informed and confident choice is available to the POSITA among the contending meanings.

## **Detailed Analysis of the Specific Questions of Fact on Which I Have Been Asked to Provide My Opinions**

### **I. Summary of the Specific Questions of Fact on Which I Have Been Asked to Provide My Opinions**

38. I have been informed and understand that the parties dispute the meaning of various claim terms in the Asserted Claims of the ’948 Patent, the ’616 Patent, and the ’518 Patent (*see* footnote 1 above), and in other asserted claims of different patents. I have not been asked by Defendants to provide my opinions related to the claim terms underlying each of the parties’ disputes in each of the Asserted Claims of the ’948 Patent, the ’616 Patent, and the ’518 Patent[10], nor have I been asked to provide my opinions related to any claim terms of any patent other than the ’948 Patent, the ’616 Patent, and the ’518 Patent[11].[12]

39. Rather, I have been asked by Defendants to provide my opinions regarding certain questions of fact relating to certain claim limitations appearing in the Asserted Claims of the ’948 Patent, ’616 Patent, and ’518 Patent (*see* footnote 1 above), In sections II, III, and IV below, I have respectively reproduced the entirety of asserted claim 1 of the ’948 Patent, asserted claim 1 of the ’616 Patent, and asserted claim 1 of the ’518 Patent, and I have annotated in bold

---

[10] For example, I have been informed by Defendants’ counsel that the parties have other disputes regarding the meaning of other claim terms in the ’948 Patent, ’616 Patent, and ’518 Patent besides the claim terms on which I have been asked to provide my opinions as to specific questions of fact (and for which I provide such opinions in Sections II, III and IV below). I have not been asked by Defendants to provide any opinion as to these other claim terms (and other disputes).

[11] For example, I have been informed by Defendants’ counsel that Taasera has asserted different patents (i.e., different than the ’948 Patent, ’616 Patent, and ’518 Patent) against one or more of the Defendants, including U.S. Patent Nos. 6,842,796, 7,673,137, 8,327,441, 8,850,517, 8,127,356, 8,819,419, 8,955,038, 9,118,634, 9,608,997, 9,628,453,, 9,860,251 and 9,923,918. I have not been asked by Defendants to provide any opinion as to any claim term in these different patents.

[12] I reserve the right to supplement or modify the content of this declaration as necessary or appropriate and in response to any other expert declarations served in this case.

the specific claim terms in this asserted claim on which I have been asked by Defendants to provide my opinions.

40. Specifically, for each of the specific patent claim terms that I have annotated in bold in sections II, III and IV below, I have been asked to consider (1) whether the patent claim term is, and was, a term of art to a POSITA at the time of the invention of the particular patent, and (2) whether the particular patent's specification (including the claims), and/or file history, provide a definition of the patent claim term.

41. If, in my opinion, the specific patent claim term was not a term of art to a POSITA (question of fact #1 above), and the particular patent's specification and/or file history did not provide a definition of the patent claim term (question of fact #2 above), then I have been asked to consider (3) whether the patent claim term, in view of the claims, specification and file history, provided objective boundaries as to the scope of the claim term to a POSITA at the time of the invention of the particular patent.

## II. U.S. Pat. No. 8,990,948

42. Immediately below, I have reproduced the entirety of asserted claim 1 of the '948 Patent, and I have annotated in bold the specific claim terms in this asserted claim on which I have been asked by Defendants to provide my opinions:

> 1. A method of providing real-time operational integrity of an application on a native computing environment, the method comprising:
>
> > monitoring, by a plurality of sensory inputs, one or more of network dialogs of the application, system operations initiated by the application, a runtime configuration of the application, resource utilization by the application, and integrity of the application;
> >
> > generating real-time behavior based events for determining the real-time operational integrity of the application executing on the native computing environment which includes a network analyzer, **an integrity processor**, an event correlation matrix, a risk correlation matrix, and **a trust supervisor**;

correlating, by the event and risk correlation matrix, threat classifications based on the temporal sequence of the generated real-time behavior based events; and

displaying, in a plurality of runtime dashboards of an administrative console of the computing environment, real-time status indications for operational integrity of the application.

### A. Summary of My Opinions on Specific Questions of Fact for the Asserted Claims of the '948 Patent

43. My opinions are more fully described below (and throughout this Declaration), but a summary of my opinions on the specific questions of fact on which I was asked to opine for the asserted claims of the '948 Patent are as follows:

- **"an integrity processor"**
  1. "integrity processor" neither is, nor was, a term of art to a POSITA at the time of the invention of the '948 Patent.
  2. Neither the '948 Patent specification (including the claims), nor the file history of the '948 Patent, provide a definition of an "integrity processor".
  3. A POSITA, at the time of the invention of the '948 Patent, would not understand the boundaries of what "an integrity processor" would comprise from the context of the claims, specification, and file history.
- **"a trust supervisor"**
  1. "trust supervisor" neither is, nor was, a term of art to a POSITA at the time of the invention of the '948 Patent.
  2. Neither the '948 Patent specification (including the claims), nor the file history of the '948 Patent, provide a definition of a "trust supervisor".
  3. A POSITA, at the time of the invention of the '948 Patent, would not understand the boundaries of what "a "trust supervisor" would comprise from the context of the claims, specification, and file history.

### B. An Integrity Processor

44. The phrase "an integrity processor" appears in Claim 1b as follows:

> [Claim 1b] generating real-time behavior-based events for determining the real-time operational integrity of the application executing on the native computing environment which includes a network analyzer, **an integrity processor**, an event correlation matrix, a risk correlation matrix, and a trust supervisor;

45. As an initial matter, it is my opinion that "integrity processor" is not a term of art for a person of ordinary skill in the art, and was not a term of art for such a person at the time of the invention of the '948 Patent (*see* paragraphs 31-32 above).

46. Claim 1 of the '948 Patent fails to specify any function, structure, or boundaries of "an integrity processor." Instead, claim 1 simply recites a "native computing environment which includes a network analyzer, **an integrity processor**, an event correlation matrix, a risk correlation matrix, and a trust supervisor." No further context from the claims is provided with respect to the term "integrity processor."

47. It is also my opinion that a person of ordinary skill in the art, at the time of the invention of the '948 Patent (*see* paragraphs 31-32 above), would not understand the boundaries of what an "integrity processor" would comprise from the context of the specification.

48. The '948 Patent does not provide a definition of an "integrity processor." Instead, the '948 Patent only uses the term with respect to inconsistent functional features of various embodiments.

49. Specifically, the '948 Patent states "[w]ith reference to FIGS. 6 and 7A-7C, the integrity processor 630 is a functional component of the endpoint trust agent 510."[13] The figures, however, to the extent they refer to an "integrity processor" at all only depict a box with word "integrity processor" within the box and do not indicate the boundaries of what an "integrity processor" comprises.[14]

---

[13] '948 Patent, 17:17-19.
[14] *See* '948 Patent, FIG. 6.

50. Furthermore, in my opinion, a person of ordinary skill in the art would understand, from the context of the ’948 Patent, that these functional descriptions are mere non-limiting embodiments. For example, the patent describes “FIGS. 6 and 7C” as mere “exemplary embodiment[s].”[15] The patent also provides many other embodiments.[16]

51. The patent also states its invention broadly in a non-limiting way, stating for example: “Although exemplary embodiments have been described in terms of a computing device or instrumented platform, it is contemplated that it may be implemented in software on microprocessors/general purpose computer,”[17] “[a]spects of the present invention shown in FIGS. 1-25, or any part(s) or function(s) thereof, may be implemented using hardware, software modules, firmware, non-transitory computer readable media having instructions stored thereon, or a combination thereof and may be implemented in one or more computer systems or other processing systems”[18] and “[a]lthough the invention is illustrated and described herein with reference to specific embodiments, the invention is not intended to be limited to the details shown.”[19]

52. The patent also explicitly admits that its functional descriptions, to the extent provided, are not intended to identify the boundaries of the term “an integrity processor”, stating: “[e]mbodiments of the present invention have been described above with the aid of functional building blocks illustrating the implementation of specified functions and relationships thereof.

---

[15] ’948 Patent, 6:43-53.
[16] *See, e.g.,* ’948 Patent, 6:20-42, 6:54-7:30.
[17] ’948 Patent, 36:40-44
[18] ’948 Patent, 37:49-54.
[19] ’948 Patent, 39:25-30.

***The boundaries of these functional building blocks have been arbitrarily defined herein for the convenience of the description***."[20]

53. Furthermore, in my opinion, a person of ordinary skill in the art would understand that the functional processes of the "integrity processor" embodiments are non-overlapping and therefore do not provide a boundary for what the term comprises. For example, the specification discusses "integrity processor" embodiments with respect to various features including being able to receive integrity events 621, which are process events (such as network protocol information), processor events (such as processor time information), system events (such as file system information), and binary analysis events (such as Denial of Service information)[21]; and applying rulesets 631 to generate integrity alerts[22] (more specifically, the integrity processor 630 "[applies] qualifying rule expressions (illustrated in FIG. 7B) in the rulesets 631, integrity alerts 632 are generated...").[23] The specification, however, never defines that the claimed "integrity processor" must perform each of these functions. Nor does the specification provide any other deterministic context for defining the boundaries of the term "integrity processor."

54. The '948 Patent File History also does not provide a definition of an "integrity processor." Some additional descriptions of an "integrity processor" can be found within the File History that align with functionalities of the "integrity processor" embodiments already laid out in the '948 Patent specification. In my opinion, a person of ordinary skill in the art, at the time of the invention of the '948 Patent (*see* paragraphs 31-32 above), would not understand

[20] '948 Patent, 39:3-10; *see also* FIG. 6 (block 630 labeled "Integrity Processor").
[21] '948 Patent, 17:16-32, FIGS. 6, 7A.
[22] '948 Patent, 15:10-19.
[23] '948 Patent, 17:16-32.

clear boundaries for the term "integrity processor" based on this language for the reasons already stated.

### C. A Trust Supervisor

55. The phrase "a trust supervisor" appears in Claim 1b as follows:

> [Claim 1b] generating real-time behavior-based events for determining the real-time operational integrity of the application executing on the native computing environment which includes a network analyzer, an integrity processor, an event correlation matrix, a risk correlation matrix, and **a trust supervisor**;

56. As an initial matter, it is my opinion that "trust supervisor" is not a term of art for a person of ordinary skill in the art, and was not a term of art for such a person at the time of the invention of the '948 Patent (*see* paragraphs 31-32 above).

57. Claim 1 of the '948 Patent fails to specify any function, structure, or boundaries of "a trust supervisor." Instead, claim 1 simply recites a "native computing environment which includes a network analyzer, an integrity processor, an event correlation matrix, a risk correlation matrix, and **a trust supervisor**." No further context from the claims is provided with respect to the term "trust supervisor."

58. It is also my opinion that a person of ordinary skill in the art, at the time of the invention of the '948 Patent (*see* paragraphs 31-32 above), would not understand the boundaries of what a "trust supervisor" would comprise from the context of the specification.

59. The '948 Patent does not provide a definition of a "trust supervisor." Instead, the '948 Patent only uses the term with respect to inconsistent functional features of various embodiments.

60. Specifically, the '948 Patent states that "FIG. 8 is a block diagram of an exemplary architecture 800 for trust orchestration including . . . a trust orchestrator 430 that may

include . . . a trust supervisor 846,"[24] that "[a]ccording to the exemplary embodiments of FIG. 8 and FIG. 10, the trust supervisor 846 can be configured to receive infection profiles 832 from the network analyzers 830 and integrity profiles 420 from the system event correlator 410,"[25] and that "[t]he trust supervisor 846 uses an event processor 1006, an event correlator 1007, a threat classifier 1008, an event correlation matrix 1013 and a rules repository 1012 to correlate events associated to a device 560 for the classification and identification of threats based on the forensic confidence of leading indicators."[26] The figures, however, to the extent they refer to a "trust supervisor" do not indicate the boundaries of what a "trust supervisor" comprises.

61. Furthermore, a person of ordinary skill in the art would understand from the context of the '948 Patent that these functional descriptions are mere non-limiting embodiments. For example, the patent describes "FIG. 8 and FIG. 10" as mere "exemplary embodiments."[27] The patent also provides many other embodiments.[28]

62. The patent also states its invention broadly in a non-limiting way, stating for example: "Although exemplary embodiments have been described in terms of a computing device or instrumented platform, it is contemplated that it may be implemented in software on microprocessors/general purpose computer,"[29] "[a]spects of the present invention shown in FIGS. 1-25, or any part(s) or function(s) thereof, may be implemented using hardware, software modules, firmware, non-transitory computer readable media having instructions stored thereon, or a combination thereof and may be implemented in one or more computer systems or other

---

[24] '948 Patent, 17:46-53; *see also id.*, FIG. 8.
[25] '948 Patent, 22:26-30; *see also id.*, FIGS. 8, 10.
[26] '948 Patent, 22:31-37.
[27] '948 Patent, 6:54-57, 6:62-64.
[28] '948 Patent, 6: 20-53, 6:58-6:61, 6:65-7:30
[29] '948 Patent, 36:40-44.

processing systems"[30] and "[a]lthough the invention is illustrated and described herein with reference to specific embodiments, the invention is not intended to be limited to the details shown."[31]

63. The patent also explicitly admits that its functional descriptions, to the extent provided, are not intended to identify the boundaries of the term "a trust supervisor", stating: "[e]mbodiments of the present invention have been described above with the aid of functional building blocks illustrating the implementation of specified functions and relationships thereof. ***The boundaries of these functional building blocks have been arbitrarily defined herein for the convenience of the description***."[32]

64. Furthermore, in my opinion, a person of ordinary skill in the art would understand that the functional aspects of the "trust supervisor" embodiments are non-overlapping and therefore do not provide a boundary for what the term comprises. For example, the specification discusses "trust supervisor" embodiments with respect to various features, including that the trust supervisor may be comprised of an event processor, an event correlator, a threat classifier, and may utilize an event correlation matrix and a rules repository[33], and that the trust supervisor be able to receive "an integrity profile for a network endpoint,"[34] "receive[] an infection profile 832 for a network endpoint,"[35] "analyze[] and classif[y] threats along with a forensic confidence score, send[] real time actions 847 to the remediation controller 848,"[36] and send "real time

[30] '948 Patent, 37:49-54.
[31] '948 Patent, 39:25-30.
[32] '948 Patent, 39:3-10; *see also id.*, FIG. 8 (block 846 labeled "Trust Supervisor").
[33] '948 Patent, 22:26-37.
[34] '948 Patent, 18:15-20, 18:23-25; *see also id.*, 14:60-15:2.
[35] '948 Patent, 18:21-23.
[36] '948 Patent, 18:25-31.

status indications 850 to a dashboard controller 870."[37] The specification, however, never defines that the claimed "trust supervisor" must perform each of these functions. Nor does the specification provide any other deterministic context for defining the boundaries of the term "trust supervisor."

65. The '948 Patent File History also does not provide a definition of a "trust supervisor." Some additional descriptions of a "trust supervisor" can be found within the File History that align with the functionalities of the "trust supervisor" embodiments already laid out in the '948 Patent. In my opinion, a person of ordinary skill in the art, at the time of the invention of the '948 Patent (*see* paragraphs 31-32 above), would not understand clear boundaries for the term "trust supervisor" based on this language for the reasons already stated.

## III. <u>U.S. Pat. No. 9,092,616</u>

66. Immediately below, I have reproduced the entirety of asserted claim 1 of the '616 Patent, and I have annotated in bold the specific claim term in this asserted claim on which I have been asked by Defendants to provide my opinions:

> 1. A method of providing an attestation service for providing runtime operational integrity of a system using a computing platform comprising **a network trust agent**, an endpoint trust agent, and a trust orchestration server, the method comprising:
>
> > sending, by the endpoint trust agent on a monitored device, a dynamic context including endpoint events and actions of the monitored device and applications executing on the monitored device at runtime;
> >
> > receiving, at the trust orchestration server, the dynamic context including the endpoint events of the monitored device and the applications executing on the monitored device at runtime;
> >
> > analyzing, by the trust orchestration server, the received endpoint events;
> >
> > receiving, by the trust orchestration server, third party network endpoint assessments;

[37] '948 Patent, 18:27-28.

generating, by the trust orchestration server, temporal events based at least in part on analyzing the third party network endpoint assessments;

correlating, by the trust orchestration server, the received endpoint events and the generated temporal events; and

generating, by the trust orchestration server, an integrity profile for the system.

### A. Summary of My Opinions on Specific Questions of Fact for the Asserted Claims of the ’616 Patent

67. My opinions are more fully described above and below (and throughout this Declaration), but a summary of my opinions on the specific questions of fact on which I was asked to opine for the asserted claims of the ’616 Patent are as follows:

- **“a network trust agent”**

  1. “network trust agent” neither is, nor was, a term of art to a POSITA at the time of the invention of the ’616 Patent.

  2. Neither the ’616 Patent specification (including the claims), nor the file history of the ’616 Patent, provide a definition of a “network trust agent”.

  3. A POSITA, at the time of the invention of the ’616 Patent, would not understand the boundaries of what “a network trust agent” would comprise from the context of the claims, specification, and file history.

### B. A Network Trust Agent

68. The phrase “a network trust agent” appears in ’616 Patent Claim 1pre as follows:

[Claim 1pre] A method of providing an attestation service for providing runtime operational integrity of a system using a computing platform comprising **a network trust agent**, an endpoint trust agent, and a trust orchestration server, the method comprising:

69. As an initial matter, it is my opinion that that “network trust agent” is not a term of art for a person of ordinary skill in the art, and was not a term of art for such a person at the time of the invention of the ’616 Patent (*see* paragraphs 31-32 above).

70. Claim 1 of the ’616 Patent fails to specify any function, structure, or boundaries of a “network trust agent.” Instead, claim 1 simply recites “a computing platform comprising a network trust agent” and other components. No further context from claim 1 is provided with respect to the term “network trust agent.”

71. It is also my opinion that a person of ordinary skill in the art, at the time of the invention of the ’616 Patent (*see* paragraphs 31-32 above), would not understand the boundaries of what “a network trust agent” would comprise from the context of the specification.

72. The ’616 Patent does not provide a definition of a “network trust agent.” Instead, the ’616 Patent only uses the term with respect to inconsistent functional features of various embodiments.

73. Specifically, the ’616 Patent refers to “an update notification to a network trust agent (see, e.g., network trust agents 1209 and 1315 depicted in FIGS. 12 and 13, respectively)”[38] The referenced figures, however, only depict a box with the term “network trust agent” within the box and do not indicate the boundaries of what a “network trust agent” comprises.[39]

74. Furthermore, a person of ordinary skill in the art would understand from the context of the ’616 Patent that the descriptions of a “network trust agent” are mere non-limiting embodiments. For example, the patent describes Figures 12 and 13 as “exemplary embodiment[s].”[40] The patent also provides many other embodiments.[41]

---

[38] ’616 Patent, 18:45-47, 52-55; *see also id.*, FIG. 12 (box 1209 labeled “Network Trust Agent”), FIG. 13 (box 1315 labeled “Network Trust Agent”), 25:15-16, 25:20-21, 25:36-45.
[39] *Id.*
[40] ’616 Patent, 7:1-7.
[41] ’616 Patent, 6:20-67, 7:8-30.

75. The patent also states its invention broadly in a non-limiting way, stating for example: "Although exemplary embodiments have been described in terms of a computing device or instrumented platform, it is contemplated that it may be implemented in software on microprocessors/general purpose computer,"[42] "[a]spects of the present invention shown in FIGS. 1-25, or any part(s) or function(s) thereof, may be implemented using hardware, software modules, firmware, non-transitory computer readable media having instructions stored thereon, or a combination thereof and may be implemented in one or more computer systems or other processing systems"[43] and "[a]lthough the invention is illustrated and described herein with reference to specific embodiments, the invention is not intended to be limited to the details shown."[44]

76. The patent also explicitly admits that its functional descriptions, to the extent provided, are not intended to identify the boundaries of the term "a network trust agent", stating: "[e]mbodiments of the present invention have been described above with the aid of functional building blocks illustrating the implementation of specified functions and relationships thereof. The ***boundaries of these functional building blocks have been arbitrarily defined herein*** for the convenience of the description."[45]

77. Furthermore, in my opinion, a person of ordinary skill in the art would understand that the functional processes of the "network trust agent" embodiments are non-overlapping and therefore do not provide a boundary for what the term comprises. For example, the specification discusses "network trust agent" embodiments with respect to various features including receiving

---

[42] '616 Patent, 36:61-64.
[43] '616 Patent, 37:3-8.
[44] '616 Patent, 7:34-36.
[45] '616 Patent, 39:23-30; *see also id.*, FIG. 12 (block 1209 labeled "Network Trust Agent"), FIG. 13 (block 1315 labeled "Network Trust Agent").

a system warning from “a trust orchestrator,”[46] “[i]n certain exemplary embodiments, the network trust agent 1209 sends messages 1210 to the computer network protocol (e.g., OpenFlow™) security framework 1211 middleware to send directives 1213 to a computer network protocol (e.g., OpenFlow™) controller 1214... to notify by means of a protocol 1215 a computer network protocol (e.g., OpenFlow™) enabled network element 1216 to apply access controls 1217 to block or divert traffic flows,”[47] and “[i]n certain exemplary embodiments, the network trust agent 1315 sends messages 1316 to the network security framework 1318 middleware to send policies 1319 to a wireless access point 1320... to apply access controls 1321 to block or divert traffic flows.”[48] Messages 1210, or called “directives”, are described as communications to “formulate commands 1213 for the computer network protocol (e.g. OpenFlow™) controller 1214.”[49] The specification, however, never defines that the claimed “network trust agent” must perform each of these functions. Nor does the specification provide any other deterministic context for defining the boundaries of the term “network trust agent.”

78. The ’616 Patent File History also does not provide a definition of a “network trust agent.” Some additional descriptions of a “network trust agent” can be found within the File History that align with the functionalities of the “network trust agent” embodiments already laid out in the ’616 Patent specification. In my opinion, a person of ordinary skill in the art, at the time of the invention of the ’616 Patent (*see* paragraphs 31-32 above), would not understand clear boundaries for the term “network trust agent” based on this language for the reasons already stated.

---

[46] ’616 Patent, 25:27-35.
[47] ’616 Patent, 25:36-45.
[48] ’616 Patent, 26:29-34.
[49] ’616 Patent, 33:7-15, 33:34-39.

## IV. U.S. Patent No. 9,071,518

79. Immediately below, I have reproduced the entirety of asserted claim 1 of the ’518 Patent, and I have annotated in bold the specific claim term in this asserted claim on which I have been asked by Defendants to provide my opinions:

1. A method for providing device management services comprising steps of:

> gathering, at a server, from a network, status information related to an operating state of each of a plurality of mobile devices, each mobile device utilizing one of a plurality of different mobile operating systems, wherein the status information for each mobile device is gathered from a plurality of sources including each mobile device in a **substantially real time** manner,
>
> formatting the status information for each of the mobile devices, such that rules can be substantially uniformly applied to the status information across the plurality of different mobile operating systems;
>
> storing the status information in an electronic database accessible to the server;
>
> evaluating, at the server, a first compliance state of each of the mobile devices from the status information using a plurality of administrator-defined rules, wherein each of the rules applies to mobile devices regardless of mobile operating system; and
>
> initiating, at the server, at least one action defined by the administrator-defined rules in response to the step of evaluating,
>
> wherein the step of evaluating is performed by the server automatically, in response to changes in the status information in the electronic database.

### A. Summary of My Opinions on Specific Questions of Fact for the Asserted Claims of the ’518 Patent

80. My opinions are more fully described above and below (and throughout this Declaration), but a summary of my opinions on the specific questions of fact on which I was asked to opine for the asserted claims of the ’518 Patent are as follows:

- **“substantially real time”**

  1. “substantially real time” neither is, nor was, a term of art to a POSITA at the time of the invention of the ’518 Patent.

2. Neither the ’518 Patent specification (including the claims), nor the file history of the ’518 Patent, provide a definition of a “substantially real time”.

3. A POSITA, at the time of the invention of the ’518 Patent, would not understand the boundaries of “substantially real time” from the context of the claims, specification, and file history.

### B. Substantially Real Time

81. The phrase “substantially real time” appears in ’518 Patent Claim 1[a] as follows:

> [Claim 1a] gathering, at a server, from a network, status information related to an operating state of each of a plurality of mobile devices, each mobile device utilizing one of a plurality of different mobile operating systems, wherein the status information for each mobile device is gathered from a plurality of sources including each mobile device in a **substantially real time** manner,

82. As an initial matter, it is my opinion that “substantially real time” is not a term of art for a person of ordinary skill in the art, and was not a term of art for such a person at the time of the invention of the ’518 Patent (*see infra* ¶¶ 31-32)

83. Claim 1 of the ’518 Patent fails to inform what is meant by the term “substantially real time,” which supposedly describes the manner in which status information from mobile devices is gathered as in Claim 1.[50]

84. Independent Claim 10 recites in relevant part:

> wherein the attribute is stored in a data store accessible to the server, that includes **substantially real-time** data, gathered from the plurality of sources on a network and pertaining to a plurality of attributes of a plurality of mobile devices, wherein the **substantially real-time** data is formatted, such that the rules can be substantially uniformly applied to the plurality of attributes across the plurality of different mobile operating systems.[51]

85. Similarly, independent claim 17 recites in relevant part:

[50] ’518 Patent, 23:57-63.
[51] ’518 Patent, 25:38-45 (emphasis added).

> wherein the data store is configured to gather **substantially real-time** data pertaining to a plurality of attributes related to an operating state of each of the plurality of mobile devices, the attributes for each mobile device being gathered from a plurality of Sources including each mobile device, wherein each mobile device utilizes one of a plurality of different mobile operating systems, and the **substantially real-time** data is formatted. Such that the rules can be substantially uniformly applied to the plurality of attributes across the plurality of different mobile operating systems.[52]

86. None of the recitations in independent claims 10 or 17 further define the term.

87. The term "substantially real-time" is also used five times throughout the patent specification,[53] but in each instance, the specification uses the term without providing any definition for it. For example:

- Using status updates 22, device database 20 can update these records and provide **substantially real-time** information about the status of mobile devices 10.[54]

- Furthermore, old status information in device database 20 can be compared to incoming status updates 22 to determine which attributes of a mobile device have changed on a **substantially real-time** basis.[55]

- Accordingly, device database 20 can maintain status information about mobile devices enrolled with the MDM system as a series of device attributes that are updated on a **substantially real-time** basis.[56]

88. Similarly, the patent prosecution history for the '518 Patent identifies that the term was included within the draft patent specification and draft claims as U.S. Patent Application 13/540,142, but provides no definition for the term. In the Applicant's Amendment and Request for Reconsideration under 35 U.S.C. § 1.116, the Applicant argued, among other points, that the amended claims traversed the prior art because the reference cited by the

[52] '518 Patent, 26:35-36 (emphasis added).
[53] '518 Patent, 2:65-3:2; 3:33-37; and 10:44-65.
[54] '518 Patent, 10:48-51.
[55] '518 Patent, 10:58-61.
[56] '518 Patent, 10:61-65.

examiner did not “teach that the absent gathering occurs in a substantially real-time manner,” but did not elaborate as to why that was the case.[57]

89. Thus, it is also my opinion that a POSITA, at the time of the invention of the ’518 Patent (*see infra* ¶¶ 31-32), would not understand the boundaries of the term “substantially real time” from the context of the claims, specification, or prosecution history.

**CONCLUSION**

90. I reserve the right to supplement or modify the content of this declaration as necessary or appropriate and in response to any other expert declarations served in this case.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 13th day of July in 2023.



Dr. Aviel D. Rubin

[57] *See* Applicant’s February 9, 2015 Amendment and Request for Reconsideration under 35 U.S.C. § 1.116 at p. 8.