# EXHIBIT S

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Patent Application of | **MAIL STOP AMENDMENT** |
| Kumar, Srinivas et al. | Group Art Unit: 2436 |
| Application No.: 13/399,065 | Examiner: Cervetti, David Garcia |
| Filed: February 17, 2012 | Confirmation No.: 3713 |
| For: System and Method for Application Attestation | |

## AMENDMENT AND REPLY UNDER 37 C.F.R. § 1.111

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

In reply to the Office Action dated April 27, 2012, Applicants submit the following Amendment and Remarks.

Amendments to the Specification begin on page 2 of this paper. Amendments to the Claims are reflected in the listing of claims, which begins on page 4 of this paper.

Remarks and Arguments begin on page 15 of this paper.

It is not believed that extensions of time or fees for net addition of claims are required beyond those that may otherwise be provided for in documents accompanying this paper. However, if additional extensions of time are necessary to prevent abandonment of this application, then such extensions of time are hereby petitioned under 37 C.F.R. § 1.136(a), and any fees required therefore (including fees for net addition of claims) are hereby authorized to be charged to our Deposit Account No. 02-4800.

**AMENDMENTS TO THE SPECIFICATION:**

Kindly amend paragraph [0008] of the specification as follows:

The presently disclosed technology also may be embodied as an additional method, apparatus and/or system for a runtime monitor to inspect web and non-web applications (e.g., all web and non-web applications) running on the instrumented target platform. The system may include an attestation service (or broker) using an attestation server and configured to generate application artifacts and/or to issue application statements or claims. The application artifact may represent an identified application instance (e.g., at runtime, globally[[, uniquely]] unique, opaquely and/or in a time-sensitive manner, for example, using an application artifact having a specified or predetermined lifetime) on an instrumented platform (such as but not limited to a, Personal Digital Assistant (PDA), a tablet computing device, an iPhone™, an iPod™, an iPad™, a device operating the Android operating system (OS) from Google Inc., a device running the Microsoft Windows® Mobile OS, a device running the Microsoft Windows® Phone OS, a device running the Symbian OS, a device running the webOS from Hewlett Packard, Inc., a mobile phone, a BlackBerry® device, a smartphone, a hand held computer, a netbook computer, a palmtop computer, a laptop computer, an ultra-mobile PC, a portable gaming system, a gaming console, or another similar type of computing device having a computer, microprocessor). The application statements may include at least one statement (or claim) about an inspected runtime execution context and/or an intelligence based security context.

Kindly amend paragraph [0025] of the specification as follows:

In certain exemplary embodiments, ~~applicants~~ applications may be secured by signing-on or authenticating applications onto the network using an attestation process (e.g., via a single factor or multi-factor attestation). In a multi-factor process, applications may be qualified based on at least two factors. A first factor may identify one or more attributes of the application (e.g., run time instance of the application) such as (1) a hash of the application, as an application fingerprint, (2) other applications/processes called by the application, (3) ports used by the application, (4) computing, storage, and network resource usage by the application, and/or (5) the platform executing the application, among ~~other~~ others. Such information may be available locally (e.g., at the computing platform running the application) in the current execution context. A second factor may identify what is known about the application based on the attributes of the application from security intelligence external to the operating environment (e.g., a third party (e.g., trusted third party) separate from the computing platform running the application).

**AMENDMENTS TO THE CLAIMS:**

This listing of claims will replace all prior versions, and listings, of claims in the application:

**LISTING OF CLAIMS:**

1. (Currently Amended) A method of providing an attestation service for an application at runtime executing on a computing platform using an attestation server, comprising:

receiving, by the attestation server remote from the computing platform:

a runtime execution context indicating attributes of the application at runtime, wherein the attributes comprise one or more executable file binaries of the application and loaded components of the application; and

a security context providing security information about the application, wherein the security information comprises an execution analysis of the one or more executable file binaries and the loaded components;

generating, by the attestation server, a report indicating security risks associated with the application based on the received runtime execution context and the received security context, as an attestation result; and

sending, by the attestation server, the attestation result associated with the application.

2. (Original) The method of claim 1, further comprising:

generating, by the attestation server, an application artifact as a reference for changes in a subsequent execution context; and

sending the generated application artifact such that subsequent changes to the runtime execution context are tracked based on the generated application artifact.

3. (Currently Amended) The method according to claim 2, further comprising digitally signing the attestation results, ~~and the application artifact~~

wherein the attributes further comprise parent-child process associations of the application.

4. (Currently Amended) The method of claim 1, wherein the received security context is an introspective security context, and wherein the execution analysis is a static, dynamic, or virtual analysis of the one or more executable file binaries and the loaded components.

5. (Currently Amended) The method of claim [[1]] 4, wherein the generating of the report indicating security risks associated with the application includes generating, by the attestation server, one or more security assertions that pertain to the received runtime execution context and the received introspective security context.

6. (Original) The method according to claim 1, further comprising authenticating the application using a plurality of collaboration services.

7. (Original) The method according to claim 1, further comprising controlling a user's transaction with the application by applying a set of authorization rules in accordance with the attestation results.

8. (Original) The method according to claim 1, further comprising controlling a user's network access to the application by applying a set of authorization rules in accordance with the attestation results.

9. (Original) The method according to claim 1, further comprising providing confidence metrics in the attestation results indicating a level of security risk by different classifications such that a restriction on a user's transaction with the application are applied based on the level of security risk indicated by the confidence metrics in the attestation results.

10. (Original) The method according to claim 9, wherein the application of the restriction on the user's transaction includes applying the restriction on the user's network access to the application.

11. (Original) The method according to claim 1, wherein the application of the restriction on the user's transaction includes applying routing decisions and redirecting the user to an alternate computer platform.

12. (Original) The method according to claim 1, further comprising controlling, by a network access enforcer, access of a user to the application based on the attestation result.

13. (Currently Amended) A non-transitory computer readable medium having instructions stored thereon that, if executed by a computing device, cause the computing device to perform operations for providing mutual attestation of applications in client-server or peer-to-peer transactions using an attestation server, the operations comprising:

generating and sending, by the attestation server, a first application artifact that dynamically and opaquely identifies:

an instance of a first application; and

a record of a current execution state of the first application;

receiving and validating, by the attestation server, from a server in the client server transaction or from a first peer in the peer-to-peer transaction, the first application artifact sent by the attestation server to a client in a client server transaction or to a second peer in the peer-to-peer transaction;

generating and sending application statements to the client and the server or the first and second peers about interrelated applications used in the client-server or peer-to-peer transactions.

14. (Currently Amended) The computer readable medium of claim 13, the operations further comprising:

generating and sending, by the attestation server, a second application artifact that dynamically and opaquely identifies:

an instance of a second application; and

a record of a current execution state of the second application;

receiving and validating, by the attestation server, from a client in the client server transaction or from a second peer in the peer-to-peer transaction, the second application artifact sent by the attestation server to a server in a client server transaction or to a first peer in the peer-to-peer transaction.

15. (Currently Amended) The computer readable medium of claim 14, wherein:

[[the]] sending [[of]] the application statements ~~to the client and the server or the first and second peers~~ comprises the following operations:

sending, by the attestation server:

[[the]] an application statement regarding a client application of the interrelated applications to the server of the client-server transaction and the application statement regarding a server application of the interrelated applications to the client of the client-server transaction; or

[[the]] an application statement regarding a first peer application of the interrelated applications to the second peer of the peer-to-peer transaction and the application statement regarding a second peer application of the interrelated applications to the first peer of the peer-to-peer transaction; and

determining, based at least in part upon the sent application statements, whether or not to exchange ~~transact~~ data ~~exchanges~~ with associated applications.

16. (Currently Amended) The computer readable medium of claim 15, wherein:

[[the]] generating [[of]] the application statements ~~includes:~~ comprises including ~~in the application statements~~ confidence metrics and contextual assertions in the application statements; and

[[the]] determining ~~whether to transact data exchanges with the associated applications~~ includes:

comparing respective confidence metrics to a set of rules; and

determining whether or not to exchange ~~transact~~ data ~~exchange~~ based on the comparison.

17. (Currently Amended) A method for providing attestation of the authenticity of a running web application or web servlet using an attestation server, comprising:

requesting an application artifact that is a dynamic, opaque reference to [[for]] a running web application or servlet instance;

establishing a secure channel between the web server and the attestation server;

generating at least one ~~hash file digest~~ digital signature corresponding to the execution context of the web application or servlet instance;

determining at least one ~~file attribute~~ parent-child process association corresponding to ~~at least one element or~~ the execution context of the web application or web servlet instance;

sending an application report to an identity provider;

generating assertions based on a received security context and a received local execution context;

transmitting confidence metrics in the report to the identity provider; and

providing attestation of the running web application or web servlet as a digital icon for rendering by a web browser.

18. (Currently Amended) The method according to claim 17, wherein the ~~attestation~~ providing is ~~provided~~ prior to commencing any data exchange in an established connection with a user.

19. (Currently Amended) The method according to claim 17, wherein the ~~attestation~~ providing is ~~provided~~ prior to establishing a network connection with a user.

20. (Original) The method according to claim 19, further comprising rendering attestation information about the web application to be accessed responsive to user input.

21. (Currently Amended) A system for continuously monitoring running applications hosted on self-managed and on-premise, or on outsourced service provider managed infrastructure comprising:

an instrumented target platform for hosting [[a]] target, running applications user or service program;

an application attestation service for:

generating [[a]] globally unique, opaque, and time-sensitive application artifact artifacts identifying records of current execution states and application statements for the target, running applications including a plurality of assertions pertaining to inspection based runtime local execution context and introspection based security context; and

remediating the instrumented target platform, wherein the remediating includes one or more of: a reimage, a snapshot, or a quarantine of the instrumented target platform;

a runtime monitor for:

discovering, identifying and inspecting running application processes on the instrumented target platform, wherein the discovering includes analysis of executable file binaries of the target, running applications; and

[[for ]]generating metadata that includes at least the runtime local execution context;

a collaboration service configured to:

provide introspected security context for [[a]] the target, running applications application running on the instrumented target platform; and

analyze executable file binaries for the target application running on the instrumented target platform; and

a graphical user interface configured to:

request and receive dynamic assertions from a metadata repository of the attestation service, the dynamic assertions pertaining to the local execution context or the introspected security context of running application instances on the instrumented target platform ~~platforms~~;

continuously display the dynamic assertions ~~to a system administrator~~; and

provision and dispatch alerts based on the dynamic assertions and predefined criteria.

22. (Currently Amended) The system according to claim 21, ~~wherein~~ further comprising a network access enforcer configured to:

~~subscribes for~~ subscribe to and ~~receives~~ receive dynamic application statements including contextual assertions from an attestation service;

[[to]] analyze the contextual assertions; and

determine whether or not an authenticated user is permitted ~~or denied network~~ to access [[to]] an attested application instance via a network.

23. (Currently Amended) The system according to claim 21, wherein the graphical user interface ~~displays~~ is further configured to:

display the applications running on the instrumented target platform [[on]] in a client specific dashboard or portal, and

~~presents~~ present, for each associated application execution context, at least one of:

a service hostname;

a service realm;

a service principal name;

a product version;

a product vendor;

one or more ~~classifications~~ classification-based confidence metrics;

an active network service port; or

executable file binaries.

24. (Currently Amended) The system according to claim 21, further comprising an identity provider ~~that queries~~ configured to:

query for dynamic application statements from the attestation server including contextual assertions;

[[to]] analyze the contextual assertions; and

[[to]] determine whether or not an authenticated user is ~~permitted~~ authorized ~~or denied authorization~~ to ~~transact~~ exchange data ~~exchanges~~ with an attested application instance [[in]] via an established connection.

25. (Currently Amended) The system according to claim 21, further comprising a network access enforcer ~~that analyzes~~ configured to:

analyze classifications based confidence metrics included in received dynamic application statements, based on a subscription, from an attestation service; and

[[to]] determine whether or not an authenticated user is permitted ~~or denied network~~ to access [[to]] an attested application instance via a network.

26. (Currently Amended) The system according to claim 21, ~~wherein an~~ further comprising an identity provider ~~analyzes~~ configured to:

analyze ~~classifications~~ classification-based confidence metrics included in received dynamic application statements, based on a subscription, from an attestation service; and

[[to]] determine whether or not an authenticated user is ~~permitted or denied authorization~~ authorized to ~~transact~~ exchange data ~~exchanges~~ with an attested application instance [[in]] via an established connection.

## REMARKS

Reconsideration of this Application is respectfully requested.

Upon entry of the foregoing amendment, claims 1-26 are pending in the application, with claims 1, 13, 17 and 21 being independent claims. Claims 1, 3-5, 13-19 and 21-26 are amended to clarify Applicants' techniques. The specification is amended to correct typographical errors. Support for the amendments is found throughout the original specification, at least at, for example paragraphs [0008], [0009], [0012], [0019], [0025], [0031], [0033], [0036] - [0038], [0045], [0047], [0058], [0060], [0062], [0081], [0083], [0090], [0092]-[0095], [0097], [0098], [0115], [0127], [0132], [0137], [0141] and [0147] and FIG. 12 and originally filed claims 1, 13, 17 and 21.

Applicants reserve the right to prosecute similar or broader claims, with respect to the amended claims, in the future.

Based on the above amendment and the following remarks, Applicants respectfully request that the Examiner reconsider all outstanding rejections and that they be withdrawn.

**Statement of Substance of Examiner Interview**

Further to the Interview Summary dated June 14, 2012 (PTO Prosecution File Wrapper Paper No. 20120607, "the Examiner's interview summary"), Applicants submit the following Statement of Substance of Interview conducted between the Examiner, Applicant Srinivas Kumar, and Applicants' representatives, Charles F. Wieland and Randall K. Baldwin. Applicants and Applicants' representatives gratefully acknowledge the courtesies extended to them by the Examiner in granting a personal interview on June 7, 2012. During the Interview, the Examiner clarified

his comments regarding his interpretation of the teachings of the applied reference. In particular, the Examiner clarified his comments regarding claims 1, 13, 17 and 21 and his interpretation of the teachings of Starnes. In the interview, Applicants' representatives and the Examiner discussed the rejection of claim 21 and the Examiner agreed that the remediating recited in this claim is not disclosed in the portion of Starnes cited in the Office Action. Applicant and Applicants' representative discussed distinctions between independent claims 1, 13, 17 and 21 and Starnes with the Examiner. Applicants' representatives and the Examiner discussed suggested claim language to convey the aforementioned distinctions between the applied reference and the claims, but no specific agreement was reached. Additional substance of the discussion and arguments in the Interview is included in the present remarks.

**Rejections Under 35 U.S.C. § 102**

The Examiner rejected claims 1-26 under 35 U.S.C. 102(b) as allegedly being anticipated by U.S. Patent Publication No. 2011/0179477 to Starnes *et al.* ("Starnes"). Applicants respectfully traverse these rejections for the reasons stated below.

For a prior art reference to anticipate the claimed invention, it must disclose each and every element as set forth in the claim. *See, Finnigan Corp. v. United States Int'l Trade Comm'n*, 180 F.3d 1354, 1365-66 (Fed. Cir. 1999). The requirements of strict identity between the claim and the prior art reference, is not met if a single element or limitation required by the claim is missing from the prior art source. *See, Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707,716 (Fed. Cir. 1984). Anticipation under 35 U.S.C. § 102 requires showing the presence

in a single reference disclosure of each and every element of the claimed invention, arranged as in the claim. See, *Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick*, 221 U.S.P.Q. 481, 485 (Fed. Cir. 1984). Further, "[a] claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." See, *Verdegaal Bros. v. Union Oil Co. of California*, 814 F.2d 628, 631 (Fed. Cir. 1987) and M.P.E.P. §2131. Applicants submit that this is not found using Starnes.

However, as discussed during the aforementioned interview, merely in order to expedite prosecution and without conceding the propriety of any rejection, Applicants have herein amended claims 1, 3, 13-19 and 21-26. Applicants respectfully submit that there are a number of patentable differences between Starnes and amended independent claims 1, 13, 17 and 21.

By way of example and not limitation, Applicants' specification describes that an "application artifact may represent an identified application instance . . . at runtime . . . in a time-sensitive manner . . . using an application artifact having a specified or predetermined lifetime" and "may include at least a registered name (e.g., a registered globally unique security principal name) for the running application instance (e.g., a user program or a service program, among others)." (Applicants' specification, paragraphs [0008] and [0012]). With reference to FIG. 1, the specification describes non-limiting embodiments wherein application artifacts 107 can "maintain a record of the state of the discovered or identified applications running on the instrumented platform 100 . . . for discovered or identified applications running on the instrumented platform 100" a "runtime monitor 102 may use the application artifacts 107 to generate attribute value assertions (e.g., assertions

regarding one or more attribute values associated with each respective running application" and an "application artifact may include previous assertions or may provide an identifier that associates the application to the previous assertions." (Applicants' specification, paragraphs [0033] and [0036]). With reference to the exemplary embodiment of FIG. 2, the specification describes a "dynamically changing application artifact 206 which may be time sensitive and may be globally unique" and "may be based on the received application execution context." (Applicants' specification, paragraph [0060]). Applicants' specification also describes exemplary embodiments for generating a "globally unique, opaque, time-sensitive application artifact." (Applicants' specification, paragraphs [0137], [0141] and [0147]).

The instant specification describes exemplary embodiments wherein "[r]esponsive to or after detection of application process start, a runtime application execution context (e.g., metadata) may be generated" and "may include . . . file attributes (for example, the file size, the publisher details, the creation and/or the modification timestamps, the digital signing, and/or the product version) for loaded components of the running target application, (3) parent-child process associations, (4) loader dependencies, and/or (5) information about active listening and/or open network ports that may be well-known and/or ephemeral; and/or executable file binaries." (Applicants' specification, paragraph [0058]). The specification describes that "attribute value assertions for the application execution context . . . may include file attributes (e.g., file size, publisher details, creation and/or modification timestamps, digital signings, and product versions) for loaded (e.g., all loaded and/or in process) components of the running target application . . . parent-child process

associations and/or loader dependencies, information about active listening and/or open network ports that are well known or ephemeral" and "may also include the executable file binaries." (Applicants' specification, paragraph [0037]). With reference to the exemplary embodiment of FIG. 5, the specification describes that "attributes of components of the running server application 501 including parent-child process associations and loader dependencies." (Applicants' specification, paragraph [0092]). Applicants' specification also describes an exemplary embodiment wherein the "the authenticity of the running application" can be verified "with a real time or near real time exchange 409 of the received metadata with one or more collaboration services 403 and the return of the application security context 410 based on the exchanged metadata" and "a static, dynamic and/or virtual execution analysis of the executable file binary." (Applicants' specification, paragraph [0081]).

Applicants have amended claim 1, 4, 13, 17 and 21 to broadly encompass the forgoing features.

For example, claim 1 as amended herein recites, *inter alia*, "a runtime execution context indicating attributes of the application at runtime, wherein ***the attributes comprise one or more executable file binaries of the application and loaded components of the application***" and "a security context providing security information about the application, wherein ***the security information comprises an execution analysis of the one or more executable file binaries and the loaded components***."

Also, for example, claims 13 and 21 recite, among other features: "generating and sending . . . a first application artifact that dynamically and opaquely identifies:

an instance of a first application; and a record of a current execution state of the first application" and "generating ***globally unique, opaque, and time-sensitive application artifacts identifying records of current execution states*** and application statements for the target, running applications," respectively.

Further, for example, claim 17 recites, *inter alia*:

> requesting ***an application artifact that is a dynamic, opaque reference to a running*** web ***application or*** servlet ***instance***;
> . . .
> generating at least one ***digital signature corresponding to the execution context of the*** web ***application or*** servlet ***instance***; [and]
> determining at least one ***parent-child process association corresponding to the execution context*** of the web application or web servlet instance[.]

**Claim 1**

On pages 2-3 of the Office Action, the Office alleges that Starnes discloses all of the features of claim 1. Specifically, the Office asserts that the features of claim 1 are disclosed in paragraphs [0017], [0023], and [0028] - [0029] of Starnes. Even assuming for the sake of argument that the Office's interpretation of the above-noted portions of Starnes is correct, which Applicants do not acquiesce to, Starnes is silent regarding the above-quoted distinguishing features of claim 1. At page 2 of the Office Action, with regard to previously-pending claim 1, the Office asserts that Starnes discloses a "runtime execution context indicating attributes of the application at runtime" at paragraph [0017], which discusses a system "configured to generate a one-time application token." Starnes discloses that "[t]he application token may include a digitally signed token . . .[t]he trust authentication broker may include a security token service (STS)" and "[t]he application token may be used by network access enforcers (e.g. firewalls), authentication brokers (e.g. security token service

(STS) and active clients (e.g. simple authentication and security layer (SASL) applications)." (Starnes, paragraphs [0009] and [0021]).

As discussed during the aforementioned interview, Starnes is directed to a system wherein a trust broker service generates "a ***one-time application token*** which includes assertions about the running target application" that is "a globally unique ***time-locked one-time application token***." (Starnes, paragraphs [0017], [0029], [0032] and [0039] (emphasis added)). Starnes describes that "the trust broker service issues an application token, which can be digitally-signed, and which includes the globally unique identifier of the application instance together with weighted trust scores assigned to that application instance on that machine." (Starnes, paragraph [0020]). Thus, Starnes' application tokens are one-time time-locked tokens that include trust scores for a specific application instance on a given machine. Nowhere does Starnes expressly or inherently disclose that the trust broker is capable of generating "a runtime execution context indicating attributes of the application at runtime, wherein the attributes comprise one or more executable file binaries of the application and loaded components of the application," as recited in claim 1.

With reference to FIG. 1, Starnes discloses that a "trust monitor service 120 detects and tracks the start and termination of applications on the operating system 105 platform . . . [t]he running application's property value assertions (PVAs) are measured at runtime and reported over a secure communications channel to a trust broker service 130 . . . [t]he trust broker service 130 requests a verification report for the running application on the target machine 100 and target platform 105" and the "trust broker service 130 generates and returns an application token 150 for the

running application." (Starnes, paragraph [0023]). Thus, as discussed during the interview, the one-time, time-locked application tokens generated by Starnes' trust broker are generated at a point in time when an application starts or terminates on a specific target machine or operating system platform. Similarly, Starnes' verification report is limited to an application running on a specific target machine or platform.

Starnes does not disclose "a security context providing security information about the application, wherein the security information comprises an execution analysis of the one or more executable file binaries and the loaded components," as recited in claim 1. Starnes describes that a "trust broker service 130 requests a verification report for the running application on the target machine 100 and target platform 105" and a "trust evaluation server may perform a real time measurement and verification of the target application or ***lookup the most recent verification test results based on a*** continuous ***monitoring schedule*** and return the verification report to the requestor." (Starnes, paragraph [0023] (emphasis added)). Starnes discloses that a "weighted trust score is a category based rating of level of concern" and "ratings are determined by factors that may include verification results, date and time of last verification scans." (Starnes, paragraph [0020]). Starnes further discloses that the trust broker service verifies the authenticity of the running application on the target device "with a ***near real time*** exchange of the metadata" with a trust evaluation server "and records of ***most recent*** measurements and ***verifications on the target device***." (Starnes, paragraphs [0028], [0032] and [0038] (emphasis added)). Thus, at best, Starnes' application verification is based on a lookup of recorded past, albeit "most recent", test results and verifications based on a "near real time exchange" of metadata or the scheduled verification scans that

occurred at a past "date and time." Aside from the above-quoted passages, Starnes lacks any disclosure or description of the "verification report", "real time measurement and verification", or the "verification test results." As such, it cannot be fairly concluded that Starnes' verification report is based on an execution analysis of executable file binaries and loaded components of the running application. Accordingly, Starnes fails to teach or suggest "wherein the security information comprises an execution analysis of the one or more executable file binaries and the loaded components," as recited in claim 1.

Starnes is also silent regarding the capability of including a runtime execution context indicating executable file binaries and loaded components of the application in the alleged 'application tokens.' Instead, Starnes describes that a "trust evaluation server" monitors a "target device 400 based on a schedule to scan and verify the state of the running applications" based upon "binary hashes and properties of all application package components including dynamically loadable modules" against checklists. (Starnes, paragraph [0037]). As discussed during the interview, verifying an application state on a given device based upon comparing the results of a scheduled scan of binary hashes and loadable modules to a set checklist is not analogous to "attributes of the application at runtime comprising executable file binaries and loaded components of the application. As such, it cannot be fairly concluded that Starnes discloses, expressly or inherently, "a runtime execution context indicating attributes of the application at runtime, wherein the attributes comprise one or more executable file binaries of the application and loaded components of the application," as recited in claim 1.

Accordingly, Applicants respectfully request that the Examiner reconsider and withdraw the rejection of claim 1, and pass this claim to allowance.

**Claims 2-12**

At least based on their respective dependencies to claim 1, claims 2-12 should be found allowable, as well as in view of their additional distinguishing features. *See, In Re Fine*, 837 F.2d 1071 (Fed. Cir. 1988) and M.P.E.P. § 2143.03.

For example, claim 3 as amended herein recites, among other features, "wherein the attributes further comprise parent-child process associations of the application." As discussed above with regard to the application attributes recited in claim 1, Starnes does not disclose "a runtime execution context indicating attributes of the application at runtime, wherein the attributes comprise one or more executable file binaries of the application and loaded components of the application." The one-time, time-locked application tokens generated by Starnes' trust broker do not comprise any parent-child process associations of an application at runtime. As such, Starnes fails to disclose application attributes comprising "parent-child process associations of the application," as recited in claim 3.

Also, for example, claim 4 as amended herein recites, *inter alia*, "wherein the execution analysis is a static, dynamic, or virtual analysis of the one or more executable file binaries and the loaded components." As discussed above, Starnes' "verification report", "real time measurement and verification" and "verification test results" do not disclose security information comprising "an execution analysis of the one or more executable file binaries and the loaded components," as recited in claim 1. Starnes lacks any disclosure of an "execution analysis of the one or more executable file binaries and the loaded components" of an application, let alone an

execution analysis that "is a static, dynamic, or virtual analysis of the one or more executable file binaries and the loaded component," as recited in claim 4.

Applicants submit that claims 3 and 4 are further allowable over Starnes for at least these additional reasons.

Accordingly, Applicants respectfully request that the Examiner reconsider and withdraw the rejections of claims 2-12, and find these claims allowable over the applied reference.

**Claim 13**

At page 3 of the Office Action, the Office alleges that Starnes discloses all of the features of independent claim 13 in the Abstract and paragraphs [0028] - [0029] and [0038] – [0039]. Even assuming *arguendo* that the Office's interpretation of the above-noted portions of Starnes is correct, which Applicants do not concede, Starnes does not disclose regarding the above-quoted distinguishing features of claim 13.

With regard to previously-pending claim 13, the Office asserts that Starnes discloses "generating and sending application statements to the client and the server or the first and second peers about interrelated applications used in the client-server or peer-to-peer transactions" at paragraphs [0038] - [0039]. (Office Action, page 3). With reference to FIG. 4, paragraphs [0038] and [0039] of Starnes discuss "a runtime application profile (metadata), which comprises at least the file hash digests, and product instance specific property value assertions (PVAs) and resources" wherein a "trust broker service 470 verifies the authenticity of the running application on the target device 400 with ***a near real time*** exchange of the metadata 471 with a trust

evaluation server 410" and "generates a globally unique ***time-locked one-time application token*** 422 and returns the token to the trust monitor service 420."

As discussed during the personal interview, Applicants submit that a "near real time" exchange of metadata comprising file hash digests and PVAs and use of a "time-locked one-time" token does not teach or suggest the application artifact features recited in previously-pending claim 13. However, merely to expedite prosecution, Applicants have amended claim 13 as noted above to further clarify the recited application artifact. For example, claim 13 as amended herein recites, among other features, "generating and sending, by the attestation server, a first ***application artifact*** that ***dynamically and opaquely identifies***: ***an instance of a*** first ***application***; ***and a record of a current execution state of the*** first ***application***."

Support for these amendments is found at least, at for example, paragraphs [0008], [0019], [0025], [0033], [0036], [0047], [0060], [0067], [0083], [0090], [0092], [0094], [0097], [0115], [0127], [0132], [0137], [0141], [0147] and FIG. 12 of the instant specification. For example, the specification describes exemplary embodiments wherein "applications may be qualified based on . . . one or more attributes of the application (e.g., run time instance of the application) such as . . . an application fingerprint, (2) other applications/processes called by the application, (3) ports used by the application, (4) computing, storage, and network resource usage by the application . . . [s]uch information may be available . . . in the current execution context" and an "application 302 may include (for example, may embed, as a markup) the received application artifact 309 as an assertion (e.g., in a security assertion markup language (SAML or other common form of markup)) to the identity

provider 303 which may use back-channel communications 310 with the attestation broker 304 to verify the application artifact 309." (Applicants' specification, paragraphs [0025] and [0067]). Also, for example, paragraph [0090] of Applicants' specification provides:

> In certain exemplary embodiments, the client application 501 and the server application 501 may be statically or dynamically linked to the API library 516 (e.g., a Trust-as-a-Service (TAAS) API library). The API library 516 may implement a set of procedure calls for applications to exchange messages (e.g., opaque and/or secure messages) with an attestation service or broker 502 that may hide the implementation details from the higher level application.

Thus, the specification describes exemplary embodiments wherein opaque messaging can be used to exchange application artifacts and subsequent change notification can be facilitated via use of an application artifact as a callback mechanism.

Applicants submit that using a trust monitor service to monitor state changes of an application such as "configuration settings, active listening ports at the transport layer of the OSI stack, and terminations of the applications" and notifying a trust broker service "in near real time" so that it can store "persistent and transient state metadata in a local database or remote repository" (Starnes, paragraph [0039]) does not disclose generating, sending, and validating an application artifact that dynamically and opaquely identifies an instance of the application and a record of a current execution state of the application. Thus, Starnes does not expressly or inherently disclose "generating and sending by the attestation server, a first application artifact that dynamically and opaquely identifies: an instance of a first application; and a record of a current execution state of the first application" and "receiving and validating . . . the first application artifact sent by the attestation server

to a client in a client server transaction or to a second peer in the peer-to-peer transaction," as recited in claim 13.

Accordingly, Applicants respectfully request that the Examiner reconsider and withdraw the rejection of claim 13, and find this claim allowable over Starnes.

**Claims 14-16**

At least based on their respective dependencies to claim 13, claims 14-16 should be found allowable, as well as in view of their additional distinguishing features.

Accordingly, Applicants respectfully request that the Examiner reconsider and withdraw the rejections of claims 14-16, and find these claims allowable over the applied reference.

**Claim 17**

At pages 3-4 of the Office Action, the Office alleges that Starnes discloses all of the features of claim 17 in the Abstract and paragraphs [0019] - [0021] and [0033] – [0040]. Even assuming *arguendo* that the Office's interpretation of the above-noted portions of Starnes is correct, to which Applicants do not acquiesce, Starnes does not disclose regarding the above-quoted distinguishing features of claim 17.

With regard to previously-pending claim 17, the Office asserts that Starnes discloses "requesting an application artifact for a running web application or servlet instance" at paragraphs [0033] - [0034] and "generating at least one hash file digest corresponding to the execution context of the web application or servlet instance" and "determining at least one file attribute corresponding to at least one element or the execution context of the web application or web servlet instance" at paragraphs [0019] - [0021]). (Office Action, page 4).

Starnes describes a "collection of digests of files, data elements and properties . . . for the running target application on the target machine (or device)" reporting "these digests and properties in a digitally-signed integrity report" and "based on the digests and property value assertions (PVAs) in the integrity report, the trust evaluation servers can verify each digest and property, to the extent possible, against a signature and reference harvest database (part of the trust scoring system)." (Starnes, paragraph [0019]). Starnes further describes that "[a]s an outcome of the evaluation of the running target application ***on the target machine by the trust scoring system***, the trust broker service issues an application token, which can be digitally-signed, and ***which includes*** the globally unique identifier of the application instance together with ***weighted trust scores assigned to that application*** instance ***on that machine***" and "[t]he application token may be used by web browsers (i.e. passive clients)." (Starnes, paragraphs [0020] and [0021] (emphasis added)). With reference to FIG. 3, Starnes describes that a "web application 340 includes (for example, embeds) the received application token as an assertion," the application token is then verified and validated and a "trust broker service 370" determines "whether logical access to the resource (the web application instance), based on an authorization profile configured for the trust broker service 370, should be granted for the user to access the web application." (Starnes, paragraphs [0033] and [0034]).

As discussed during the aforementioned interview, Applicants submit that a use of a digitally-signed integrity report and an application token including weighted trust scores assigned to a web application on a particular machine by a web browser to determine whether or not to grant user access to the web application does not

teach or suggest the application artifact and file attribute features recited in previously-pending claim 17. However, as noted above, merely to expedite prosecution, Applicants have amended claim 17 to further clarify the recited application artifact and execution context. For example, claim 17 recites, *inter alia*:

> requesting ***an application artifact that is a dynamic, opaque reference to a running*** web ***application or*** servlet ***instance***;
> . . .
> generating at least one ***digital signature corresponding to the execution context*** of the web application or servlet instance; [and]
> determining at least one ***parent-child process association corresponding to the execution context***.

By way of example and not limitation, Applicants' specification describes that runtime application and client application contexts can include "file attributes of components" of a running server or client application "including parent-child process associations and loader dependencies." (Applicants' specification, paragraphs [0038], [0058], [0092] and [0094]). Starnes discloses a "digitally-signed integrity report" and verifying "digests and property value assertions (PVAs) in the integrity report . . . against a signature and reference harvest database" that is part of a "trust scoring system." (Starnes, paragraph [0019]). However, nowhere does Starnes disclose "an application artifact that is a dynamic, opaque reference to a running web application or servlet instance," generating a "digital signature corresponding to the execution context of the web application or servlet instance," or determining a "parent-child process association corresponding to the execution context," as recited in claim 17. As such, Starnes does not anticipate independent claim 17.

Accordingly, Applicants respectfully request that the Examiner reconsider and withdraw the rejection of claim 17, and find this claim allowable over the applied reference.

**Claims 18-20**

At least based on their dependencies from independent claim 17, claims 18-20 should be found allowable, as well as in view of their additional distinguishing features.

Accordingly, Applicants respectfully request that the Examiner reconsider and withdraw the rejections of claims 18-20, and pass these claims to allowance.

**Claim 21**

At pages 4-6 of the Office Action, the Office alleges that Starnes discloses all of the features of independent claim 22 in the Abstract and paragraphs [0007] - [0010], [0020], [0025] - [0029], [0031] - [0034], [0037], and [0039]. Even assuming for the sake of argument that the Office's interpretation of the above-noted portions of Starnes is correct, which Applicants do not concede, Starnes does not disclose regarding the above-quoted distinguishing features of claim 22.

As noted in the Examiner's interview summary, during the interview the Examiner "agreed that Starnes does not teach 'remediating' on the cited section." Applicants agree and further note that "remediating the instrumented target platform, wherein the remediating includes one or more of: a reimage, a snapshot, or a quarantine of the instrumented target platform," as recited in claim 21 is not disclosed in the cited portion of Starnes (e.g., paragraph [0037]) or any other portion. In fact, Starnes is silent regarding any of the above-noted remediating elements of reimaging, taking a snapshot, or quarantining a platform.

As was clarified during the interview, the reference to "par.20" at page 5 of the Office Action as allegedly disclosing "continuously display the dynamic assertions to a system administrator" is a typographical error and the Examiner meant to state

"par.21." Starnes describes that a web browser "can display an ***application trust attestation logo*** at the bottom of the web page ***displayed to the user*** to provide attestation of application authenticity and trustworthiness . . . ***[t]he user that clicks that*** application trust attestation ***logo*** is shown application instance specific trust score" that was "issued (digitally-signed) by the trust broker service for that given target web application" based upon an application token "used . . . to determine ***near real-time information*** about the state of a running application ***on a target machine***." (Starnes, paragraph [0021] (emphasis added)). As discussed during the interview, Applicants submit that Starnes' trust attestation logo that can be selected by a specific user to show a "specific trust score" for an application based on near-real time information about the application on a specific target machine does not disclose a "a graphical user interface configured to: ***request and receive dynamic assertions***. . . pertaining to the local execution context or the introspected security context of running application instances" and "***continuously display the dynamic assertions***," as recited in claim 21.

With regard to previously-pending claim 21, the Office alleges paragraph [0039] of Starnes teaches "generating a globally unique, opaque, and time-sensitive application artifact and application statements including a plurality of assertions pertaining to inspection based runtime local execution context and introspection based security context." As noted above, without acquiescing to the propriety of any rejection, Applicants have amended claim 21 to clarify the recited application artifact. For example, amended claim 21 recites, among other features, "generating globally unique, opaque, and time-sensitive application ***artifacts identifying records of current execution states*** and application statements ***for the target, running***

***applications*** including a plurality of assertions pertaining to inspection based runtime local execution context and introspection based security context."

Starnes describes that the trust broker service "generates a globally unique ***time-locked one-time application token***", a trust monitor service "***monitors*** the running applications instances for ***state changes***, including . . . ***configuration settings***, active listening ports at the transport layer of the OSI stack, and ***terminations of the applications***" and the trust broker service "***stores persistent*** and transient ***state metadata*** in a local database or remote repository . . . ***for all registered*** running ***applications*** instances ***on the target device***." (Starnes, paragraph [0039] (emphasis added)). As discussed during the aforementioned interview, Applicants submit that using time-locked one time application tokens, monitoring application state changes such as configuration settings and terminations and storing persistent state metadata for registered applications on a specific target device is not analogous to "generating globally unique, opaque, and time-sensitive application ***artifacts identifying records of current execution states*** and application statements ***for the target, running applications***," as recited in claim 21.

Claim 21 also recites "discovering, identifying and inspecting running application processes on the instrumented target platform, wherein the discovering includes analysis of executable file binaries of the target, running applications." Starnes is silent regarding the capability of discovering applications through analysis of executable file binaries of running applications. In contrast, the application discovery recited in claim 21 is performed through analyzing an executing binary of a currently-running application.

Thus, Starnes fails to expressly or inherently disclose at least the above-noted distinguishing features of claim 21.

Accordingly, Applicants respectfully request that the Examiner reconsider and withdraw the rejection of claim 21 and find this claim allowable over Starnes.

**Claims 22-26**

At least based on their dependencies from claim 21, claims 22-26 should be found allowable, as well as in view of their additional distinguishing features.

Accordingly, Applicants respectfully request that the Examiner reconsider and withdraw the rejections of claims 22-26, find these claims allowable over the applied reference.

## CONCLUSION

All of the stated grounds of rejection have been properly traversed, accommodated, or rendered moot. Applicants therefore respectfully request that the Examiner reconsider all presently outstanding rejections and that they be withdrawn. Applicants believe that a full and complete reply has been made to the outstanding Office Action and, as such, the present application is in condition for allowance. If the Examiner believes, for any reason, that personal communication will expedite prosecution of this application, the Examiner is invited to telephone the undersigned at the number provided.

Prompt and favorable consideration of this Amendment and Reply is respectfully requested.

Respectfully submitted,

BUCHANAN INGERSOLL & ROONEY PC

Date: 29 June 2012

By: / R. K. Baldwin /
Randall K. Baldwin
Attorney for Applicants
Registration No. 59,713

**Customer No. 21839**
703 836 6620

Patent
Attorney Docket No. 0079152-000002

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Patent Application of | **MAIL STOP AMENDMENT** |
| Kumar, Srinivas et al. | Group Art Unit: 2436 |
| Application No.: 13/399,065 | Examiner: Cervetti, David Garcia |
| Filed: February 17, 2012 | Confirmation No.: 3713 |
| For: System and Method for Application Attestation | |

## FIRST INFORMATION DISCLOSURE STATEMENT

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

In accordance with the duty of disclosure as set forth in 37 C.F.R. § 1.56, the accompanying information is being submitted in accordance with 37 C.F.R. §§ 1.97 and 1.98.

In accordance with 37 C.F.R. § 1.98(a)(2), copies of the listed U.S. patent application publications cited on the attached IDS Form are not submitted.

The documents are being submitted after a first Office Action on the merits but prior to the closing of prosecution, therefore under 37 C.F.R. § 1.97(c), the fee set forth in 37 C.F.R. § 1.17(p) is enclosed.

A fee of $180.00 (1806) as set forth in 37 C.F.R. § 1.17(p) is enclosed.

To assist the Examiner, the documents are listed on the attached form PTO/SB/O8. It is respectfully requested that an Examiner-initialed copy of this form be returned to the undersigned.

The Director is hereby authorized to charge any appropriate fees under 37 C.F.R. §§ 1.16, 1.17 and 1.21 that may be required by this paper, and to credit any overpayment, to Deposit Account No. 02-4800.

Respectfully submitted,

BUCHANAN INGERSOLL & ROONEY PC

Date: 29 June 2012

By: / R. K. Baldwin /
Randall K. Baldwin
Registration No. 59,713

**Customer No. 21839**
703 836 6620

PTO/SB/08a (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Substitute for form 1449A/PTO **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** *(Use as many sheets as necessary)* | ***Complete if Known*** | |
|---|---|---|
| | *Application Number* | **13/399,065** |
| | *Filing Date* | **February 17, 2012** |
| | *First Named Inventor* | **Kumar, Srinivas** |
| | *Art Unit* | **2436** |
| | *Examiner Name* | **Cervetti, David Garcia** |
| Sheet 1 of 1 | *Attorney Docket Number* | **0079152-000002** |

## U.S. PATENT DOCUMENTS

| Examiner Initials' | Cite No.[1] | Document Number Number-Kind Code[2] *(if known)* | | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | | **US-2009/0144818** | A1 | 06-04-2009 | Kumar *et al.*. | |
| | | **US-2009/0138939** | A1 | 05-28-2009 | Kumar *et al.* | |
| | | **US-2009/0276204** | A1 | 11-05-2009 | Kumar *et al.* | |
| | | **US-2009/0241170** | A1 | 09-24-2009 | Kumar *et al.* | |
| | | **US-2009/0133110** | A1 | 05-21-2009 | Kumar *et al.* | |
| | | **US-2009/0328186** | A1 | 12-31-2009 | Pollutro *et al.* | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

## FOREIGN PATENT DOCUMENTS

| Examiner Initials' | Cite No.[1] | Foreign Patent Document Country Code[3] Number[4] Kind Code [5]*(if known)* | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. 1 Applicant's unique citation designation number (optional). 2 See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. 3 Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). 4 For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. 5 Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. 6 Applicant is to place a check mark here if English language Translation is attached.

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 13399065 |
| **Filing Date:** | 17-Feb-2012 |
| **Title of Invention:** | SYSTEM AND METHOD FOR APPLICATION ATTESTATION |
| **First Named Inventor/Applicant Name:** | Srinivas KUMAR |
| **Filer:** | Randall K. Baldwin/Ritsuko Dale |
| **Attorney Docket Number:** | 0079152-000002 |

Filed as Large Entity

## Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| Submission- Information Disclosure Stmt | 1806 | 1 | 180 | 180 |
| | **Total in USD ($)** | | | **180** |

# Electronic Acknowledgement Receipt

| | |
|---|---|
| EFS ID: | 13146423 |
| Application Number: | 13399065 |
| International Application Number: | |
| Confirmation Number: | 3713 |
| Title of Invention: | SYSTEM AND METHOD FOR APPLICATION ATTESTATION |
| First Named Inventor/Applicant Name: | Srinivas KUMAR |
| Customer Number: | 21839 |
| Filer: | Randall K. Baldwin/Ritsuko Dale |
| Filer Authorized By: | Randall K. Baldwin |
| Attorney Docket Number: | 0079152-000002 |
| Receipt Date: | 29-JUN-2012 |
| Filing Date: | 17-FEB-2012 |
| Time Stamp: | 15:45:24 |
| Application Type: | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $180 |
| RAM confirmation Number | 3116 |
| Deposit Account | 024800 |
| Authorized User | BALDWIN,RANDY |

The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows:

Charge any Additional Fees required under 37 C.F.R. Section 1.16 (National application filing, search, and examination fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.17 (Patent application and reexamination processing fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.19 (Document supply fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.20 (Post Issuance fees)

Charge any Additional Fees required under 37 C.F.R. Section 1.21 (Miscellaneous fees and charges)

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | | 13-399065_AMDT_04-27-12-OA.pdf | 1438647<br>a371472708cbe4cecb1dc8a766e033073f4051e7 | yes | 35 |

**Multipart Description/PDF files in .zip description**

| Document Description | Start | End |
|---|---|---|
| Amendment/Req. Reconsideration-After Non-Final Reject | 1 | 1 |
| Specification | 2 | 3 |
| Claims | 4 | 14 |
| Applicant Arguments/Remarks Made in an Amendment | 15 | 35 |

**Warnings:**

**Information:**

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 2 | | 13-399065_IDS-SBO8.pdf | 126831<br>2bd4721a46581f5f149214ee44b8f1b20170ef2e | yes | 3 |

**Multipart Description/PDF files in .zip description**

| Document Description | Start | End |
|---|---|---|
| Transmittal Letter | 1 | 2 |
| Information Disclosure Statement (IDS) Form (SB08) | 3 | 3 |

**Warnings:**

**Information:**

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 3 | Fee Worksheet (SB06) | fee-info.pdf | 30480<br>7f145e98b67aea20112b745e9780782bf310d087 | no | 2 |

**Warnings:**

**Information:**

**Total Files Size (in bytes):** 1595958

**This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.**

**New Applications Under 35 U.S.C. 111**

**If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.**

**National Stage of an International Application under 35 U.S.C. 371**

**If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.**

**New International Application Filed with the USPTO as a Receiving Office**

**If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.**

PTO/SB/06 (07-06)
Approved for use through 1/31/2007. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| **PATENT APPLICATION FEE DETERMINATION RECORD** Substitute for Form PTO-875 | Application or Docket Number 13/399,065 | Filing Date 02/17/2012 | ☐ To be Mailed |
|---|---|---|---|

## APPLICATION AS FILED – PART I

| FOR | NUMBER FILED (Column 1) | NUMBER EXTRA (Column 2) | SMALL ENTITY ☒ RATE ($) | FEE ($) | OR | OTHER THAN SMALL ENTITY RATE ($) | FEE ($) |
|---|---|---|---|---|---|---|---|
| ☐ BASIC FEE (37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | | | N/A | |
| ☐ SEARCH FEE (37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | | | N/A | |
| ☐ EXAMINATION FEE (37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | | | N/A | |
| TOTAL CLAIMS (37 CFR 1.16(i)) | minus 20 = | * | X $ = | | OR | X $ = | |
| INDEPENDENT CLAIMS (37 CFR 1.16(h)) | minus 3 = | * | X $ = | | | X $ = | |
| ☐ APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $250 ($125 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | | | | |
| | | | TOTAL | | | TOTAL | |

* If the difference in column 1 is less than zero, enter "0" in column 2.

## APPLICATION AS AMENDED – PART II

| AMENDMENT | 06/29/2012 | CLAIMS REMAINING AFTER AMENDMENT (Column 1) | | HIGHEST NUMBER PREVIOUSLY PAID FOR (Column 2) | PRESENT EXTRA (Column 3) | SMALL ENTITY RATE ($) | ADDITIONAL FEE ($) | OR | OTHER THAN SMALL ENTITY RATE ($) | ADDITIONAL FEE ($) |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total (37 CFR 1.16(i)) | * 26 | Minus | ** 26 | = 0 | X $30 = | 0 | OR | X $ = | |
| | Independent (37 CFR 1.16(h)) | * 4 | Minus | ***4 | = 0 | X $125 = | 0 | OR | X $ = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | | OR | | |
| | | | | | | TOTAL ADD'L FEE | **0** | OR | TOTAL ADD'L FEE | |

| AMENDMENT | | CLAIMS REMAINING AFTER AMENDMENT (Column 1) | | HIGHEST NUMBER PREVIOUSLY PAID FOR (Column 2) | PRESENT EXTRA (Column 3) | RATE ($) | ADDITIONAL FEE ($) | | RATE ($) | ADDITIONAL FEE ($) |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total (37 CFR 1.16(i)) | * | Minus | ** | = | X $ = | | OR | X $ = | |
| | Independent (37 CFR 1.16(h)) | * | Minus | *** | = | X $ = | | OR | X $ = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | | OR | | |
| | | | | | | TOTAL ADD'L FEE | | OR | TOTAL ADD'L FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

Legal Instrument Examiner:
/SUSAN FORD/

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*