# Exhibit 3

Patent
Attorney Docket No. 0079152-000016

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | | |
|---|---|---|
| In re Patent Application of | ) | **MAIL STOP RCE** |
| Kumar, Srinivas | ) | Group Art Unit: 2431 |
| Application No.: 13/559,766 | ) | Examiner: SAVENKOV, Vadim |
| Filed: July 27, 2012 | ) | Confirmation No.: 9330 |
| For: Systems and Methods for Threat Identification and Remediation | ) | |

**AMENDMENT UNDER 37 C.F.R. § 1.114**

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Madam:

In response to the Office Action dated January 17, 2014, please amend the above-identified patent application as follows.

## AMENDMENTS TO THE CLAIMS:

This listing of claims will replace all prior versions, and listings, of claims in the application:

## LISTING OF CLAIMS:

1. (Currently Amended) A method of providing an attestation service for providing runtime operational integrity of a system using a computing platform comprising a network trust agent, an endpoint trust agent, and a trust orchestration server, the method comprising:

sending, by the endpoint trust agent on a monitored device, a dynamic context including endpoint events and actions of the monitored device and applications executing on the monitored device at runtime;

receiving, at the trust orchestration server, [[a]] the dynamic context including the endpoint events of [[a]] the monitored device and the applications executing on the monitored device at runtime ~~thereon~~;

analyzing, by the trust orchestration server, the received endpoint events;

receiving, by the trust orchestration server, third party network endpoint assessments;

generating, by the trust orchestration server, temporal events based at least in part on analyzing the third party network endpoint assessments;

correlating, by the trust orchestration server, the received endpoint events and the generated temporal events; and

generating, by the trust orchestration server, an integrity profile for the system.

2. (Cancelled).

3. (Previously Presented) The method of claim 1, wherein the third party network endpoint assessments are received from an endpoint assessment service.

4. (Previously Presented) The method of claim 3, further comprising:

receiving, by the trust orchestration server, integrity measurement and verification reports from the endpoint assessment service.

5. (Previously Presented) The method of claim 1, wherein the third party network endpoint assessments are received from one or more collaboration services.

6. (Previously Presented) The method of claim 5, further comprising:

receiving, by the trust orchestration server, integrity measurement and verification reports from the one or more collaboration services.

7. (Previously Presented) The method of claim 1, wherein

the endpoint events of the monitored device are received by a system event correlator of the trust orchestration server from endpoint trust agents, and

the temporal events are generated by a trust broker of the trust orchestration server and are received by the system event correlator from the trust broker.

8. (Currently Amended) A method of providing flow level remediation to isolate infected or compromised systems and platforms from a computing network fabric using a network trust agent, an endpoint trust agent, and a trust orchestrator, the method comprising:

generating, by the endpoint trust agent on an endpoint device, runtime system integrity alerts regarding execution anomalies and risks based on rulesets and a calculus of risk hypothesized by runtime actions and activities of monitored applications executing on [[an]] the endpoint device;

sending, by the endpoint trust agent, runtime system integrity warnings as endpoint events of the endpoint device to the trust orchestrator;

generating, by the trust orchestrator, a system integrity profile for the endpoint device based on analysis of the received endpoint events;

processing and correlating, by the trust orchestrator, one or more of:

a system integrity profile generated based on a calculus of risk,

a plurality of temporal events generated based on a normalization and collation of elements in endpoint assessment reports received from a plurality of collaboration services, and

a system infection profile received from a network analyzer;

sending, by the trust orchestrator to the network trust agent, system warnings based on endpoint execution state assessments; and

sending, by the network trust agent, messages or directives to computer network protocol security frameworks and/or controllers to apply flow controls based on the received execution state as a threat posture of a connection endpoint.

9. (Original) The method of claim 8, wherein the integrity warnings comprise warnings regarding data events and content events; and wherein the endpoint events comprise data events and content events.

10. (Original) The method of claim 8, wherein the remediation of an infected system is achieved without adversely reducing the total operating capacity or availability of the computing platform through on-demand instantiation and scaling of workloads.

11. (Previously Presented) The method of claim 10, further comprising forwarding a notification conveying by a service accessed by a user from a mobile computing device an infected or compromised state of a mobile computing application on the mobile computing device associated with the user, wherein the notification is one or more of:

an asynchronous push notification to an account associated with the user;

a short messaging service (SMS) text alert message forwarded to a phone number associated with the mobile computing device;

an email alert message forwarded to an email address associated with the user; and

a warning message displayed by a service on a display of the mobile computing device during initiation of a transaction with a service from the mobile computing device.

12. (Currently Amended) The method of claim 11, wherein one or more services accessed by [[a]] the mobile computing device are configured to be denied or restricted as a remediation action by a service provider.

13. (Previously Presented) The method of claim 12, wherein the remediation action is based on the geo-location of the device, user and associated service accessed by the user.

14. (Previously Presented) The method of claim 1, further comprising:

generating, by a trust supervisor, one or more tiered remediation actions based on real time warning associated with the operational runtime integrity of applications executing on an infected system;

receiving, at a remediation controller of the trust orchestrator, the tiered remediation actions; and

sending, by the trust orchestrator, to the network trust agent, one or more system warnings pertaining to a network device associated with the one or more tiered remediation actions.

15. (Currently Amended) The method of claim 14, further comprising:

generating and sending, by the network trust agent, directives to formulate commands for [[an]] a computer network protocol controller;

sending, by the computer network protocol controller, rules to a computer network protocol enabled network element or switch of the network fabric to divert or block traffic flow to/from the network device; and

enforcing, by the computer network protocol enabled network element or switch, received access restrictions or controls for the network device.

16. (Previously Presented) The method of claim 15, further comprising:

monitoring and sending, by the trust supervisor, reputation score updates for the network device to the remediation controller;

sending, by the trust orchestrator, system security posture status updates for the network device to the network trust agent; and

generating and sending, by the network trust agent, to the computer network protocol security framework, directives to formulate commands for the computer network protocol controller to restore normal flows to/from the network device.

17. (Previously Presented) The method of claim 8, further comprising:

determining, by the network analyzer, threat behaviors based on network activity correlation and malware detection based on a threat life cycle model; and

dispatching, by the trust orchestrator, the image files and attributes of an application for binary analysis, wherein the image files comprise compiled, intermediate, or interpreted code or scripts;

receiving a result of the binary analysis result identifying malicious activity as a set of threats identified based on the analysis; and

caching, by the trust broker, the results of the analysis indexed by a unique identifier for the image; and

generating and returning an image profile to the endpoint trust agent comprising assertions of malicious capabilities of the image to be monitored at runtime for subsequent generation of endpoint events by the endpoint trust agent.

18. (Original) The method of claim 17, wherein the binary analysis is performed by one or more third party malware analyzers, and wherein the dispatch mechanism uses trigger filter expressions that specify a set of criteria that warrant initiation of image analysis such as frequency and volume of requests for analysis associated with the application image across deployed endpoint trust agents.

19. (Original) The method of claim 18, wherein the third party malware analyzers are configured to perform static and dynamic analysis of application images based on policies specified by the trust broker.

20. (Previously Presented) A system for providing runtime operational integrity by determining execution anomalies and a threat posture of applications executing on computing platforms including mobile devices and client-server systems, the system comprising:

(i) an endpoint trust agent including:

a process monitor configured to observe the runtime execution context of applications executing on the computer platforms and transient operating states,

a socket monitor configured to observe runtime network activities of the applications for transient states, and

a resource utilization module monitor configured to observe the types and extent of system and platform resources consumed by the applications that may provide evidence of infected systems; and

an application integrity module configured to assess runtime operational integrity of a monitored application instance running on an instrumented device based on a ruleset to deem local actions and activities of the application to be at risk;

wherein native machine instrumentation for the computing platform is configured to (a) represent event subscriptions, callbacks, notification mechanisms provided by an operating system (OS) on the computing platforms, and (b) generate raw events;

(ii) extended trust instrumentation;

(iii) a runtime monitor configured to:

subscribe to and receive near real time asynchronous notifications of runtime operation invocations by applications executing on the computer platforms from the extended trust instrumentation, and

generate and send dynamic expressions or rules as application activity filters linked to runtime operation invocations of running instances of the applications;

(iv) a system event correlator configured to correlate system events of the computing platforms to determine a calculus of risk;

(v) a trust orchestrator configured to orchestrate actionable intelligence based on the calculus of risk by integrating security intelligence about the computing platforms and the applications; and

(vi) an endpoint trust sensor configured to measure runtime operational integrity of the computing platforms by evaluating risk based on actions of an application executing on, or a user of, the computing platforms and receiving the raw events from the native machine instrumentation.

21. (New) The method of claim 1, further comprising:

performing, by a malware analyzer, detection of code obfuscation and evasion techniques in reverse engineered code of the applications, the code obfuscation and evasion techniques including at least one of: multiple packing, anti-debug, anti-trace, anti-memory, and anti-emulation.

## REMARKS

Favorable reconsideration of this application as presently amended, and in light of the following discussion, is respectfully requested.

Claims 1 and 3-21 are pending in this application, Claim 2 having been cancelled without prejudice or disclaimer; Claims 1, 8, 12, and 15 having been presently amended; and Claim 21 having been added. Support for amended Claims 1, 8, 12, and 15, and new Claim 21 can be found in the original claims, drawings, and specification as filed.[1] No new matter has been added.

In the outstanding Office Action, Claim 20 was rejected under 35 U.S.C. § 112, first paragraph; Claims 1-7 and 14-16 were rejected under 35 U.S.C. § 103(a) as unpatentable over Helman et al. (U.S. Patent Publication No. 2009/0328222; hereinafter "Helman") in view of Neystadt et al. (U.S. Patent Publication No. 2008/0244748; hereinafter "Neystadt") and Wootton et al. (U.S. Patent Publication No. 2012/0110174; hereinafter "Wootton"); Claims 8-13 were rejected under 35 U.S.C. § 103(a) as unpatentable over Helman in view of Alperovitch et al. (U.S. Patent No. 8,214,497; hereinafter "Alperovitch") and Wootton; Claim 17 was rejected under 35 U.S.C. § 103(a) as unpatentable over Helman in view of Alperovitch et al. (U.S. Patent No. 8,214,497; hereinafter "Alperovitch"), Wootton, "Static Analysis of Executables for Collaborative Malware Detection on Android" (hereinafter "Schmidt"), and Wysopal et al. (U.S. Patent Publication No. 2012/0072968; hereinafter "Wysopal"); Claims 18 and 19 were rejected under 35 U.S.C. § 103(a) as unpatentable over Helman in view of Alperovitch, Wootton,

[1] See, e.g., original Claim 2; and paragraphs [0032] and [0121] of the specification.

Schmidt, Wysopal, and Neystadt; and Claim 20 was rejected under 35 U.S.C. § 103(a) as unpatentable over Helman in view of "Windows Management Instrumentation: Create WMI Providers to Notify Applications of System Events" (hereinafter "MSDN") and Wootton.

Applicants acknowledge with appreciation the courtesy of Examiner Savenkov in granting an interview in this case with Applicants' representative on April 2, 2014, during which time the issues in the outstanding Office Action were discussed as substantially summarized hereinafter and also on the Interview Summary Sheet. No agreement was reached during the interview pending a formal response to the outstanding Office Action.

In regard to the rejection of Claim 20 under 35 U.S.C. § 112, first paragraph, page 6 of outstanding Office Action asserts that the claimed "transient operating states and transient states are believed to not be defined in Applicant's specification." Applicants respectfully disagree. As explained during the interview, these terms are described at, for example, paragraphs [0040], [0065], [0068], [0078], and [0083] of the specification. Specifically, paragraph [0040] of the specification describes that behavior deviations from a baseline healthy operational state to a vulnerable or compromised state may be detected. As this portion of the specification describes detecting behavior deviations form a healthy operational state to a vulnerable or healthy state, support is given for the feature of observing transient (i.e. changing) states/operating states, as recited in Claim 20. Paragraph [0068] of the specification describes that "temporal events 409 can be expressed as assertions about operational parameters (e.g.,

vulnerabilities, compliance, patch level, etc.) based on enterprise policies established for a baseline configuration. The trust broker 407 serves as a moderator that aggregates endpoint operational state measurements for situation awareness and threat identification by the trust orchestrator 430." As this paragraph of the specification describes that the trust broker 407 aggregates (and hence obtains) endpoint operational state measurements for threat identification, Applicants respectfully submit that adequate support is given for the feature of observing transient (i.e. changing) states/operating states, as recited in Claim 20.

Accordingly, Applicants respectfully request that the rejection of Claim 20 under 35 U.S.C. § 112, first paragraph, be withdrawn.

In response to the rejections under 35 U.S.C. § 103(a), Applicants have amended Claim 1 to include, *inter alia*, features of former Claim 2. Applicants respectfully submit that amended Claim 1 recites novel features not taught or rendered obvious by the applied references.

By way of background, independent Claim 1 is directed to a method of providing an attestation service for providing runtime operational integrity of a system using a computing platform comprising a network trust agent, and endpoint trust agent, and a trust orchestration server, the method including:

> ***sending, by the endpoint trust agent on a monitored device, a dynamic context including endpoint events and actions of the monitored device and applications executing on the monitored device at runtime;***
>
> ***receiving, at the trust orchestration server, the dynamic context including the endpoint events of the***

***monitored device and the applications executing on the monitored device at runtime;***

analyzing, by the trust orchestration server, the received endpoint events;

receiving, by the trust orchestration server, third party network endpoint assessments;

generating, by the trust orchestration server, temporal events based at least in part on analyzing the third party network endpoint assessments;

correlating, by the trust orchestration server, the received endpoint events and the generated temporal events; and

generating, by the trust orchestration server, an integrity profile for the system.

Independent Claims 8 and 20, although varying in claim scope and/or statutory class, recite similar features as Claim 1. Thus, the arguments presented below with respect to Claim 1 are also applicable to independent Claims 8 and 20.

Turning now to the applied references, page 10 of the outstanding Office Action acknowledges that Helman and Neystadt do "not disclose…applications executing thereon." In an attempt to cure the above-noted deficiencies of Helman and Neystadt, the outstanding Office Action cites paragraphs [0040], [0049], and [0052] of Wootton.

However, as explained during the interview, Applicants respectfully submit that Wootton fails to teach or suggest "sending, by the endpoint trust agent on a monitored device, a dynamic context including ***endpoint events and actions of the monitored device and applications executing on the monitored device at runtime***; receiving, at the trust orchestration server, the dynamic context including the endpoint events of

the monitored device and the applications executing on the monitored device at runtime," as recited in Claim 1.

Wootton is directed to storing application programs for mobile communications devices in a data store. The applications may be collected from any number of different sources, such as through an application programming interface (API), from web crawling, from users, or combinations of these. The applications are analyzed and the analysis results reported.[2] Thus, Wootton describes API analysis, not the analysis of actions of an application executing on a monitored device at runtime, as in Applicants' amended Claim 1.

Paragraph [0040] of Wootton states:

> In an embodiment, application data also includes behavioral data. Behavioral data includes information about how an application interacts with or uses a mobile communication device's resources, such as memory usage, battery usage, network usage, storage usage, CPU usages, API usage, errors and crashes, network services connected to (e.g., remote host address and port), and runtime library linkage. Behavioral data also includes information about how an application, file or data object, when it is run, utilizes the functionalities of the mobile communication device's operating system, such as notifications and messaging between processes or installed applications.

Hence, the above paragraph of Wootton describes that the application data includes behavioral data, and the behavioral data includes information about how an application interacts with or uses a mobile communication device's resources, such as memory usage, battery usage, network usage, storage usage, CPU usages, API usage, errors and crashes, network services connected to (e.g., remote host address and port),

[2] See the Abstract of Wootton.

and runtime library linkage. However, the above paragraph does not describe that an endpoint trust agent (that is on the monitored device) sends a dynamic context including endpoint events and actions of the monitored device and applications running on the monitored device at runtime, and that a trust orchestration server receives the sent dynamic contest including the endpoint events and the actions of the monitored device and applications running on the monitored device at runtime. Wootton describes the use of a whitelist, a blacklist, and static/dynamic analysis to evaluate data.[3] However, in Wootton, there is no live correlation of application actions on a device, instead behavioral data is collected from an emulator running the application and it is heuristics based.[4]

Thus, Applicants respectfully submit that independent Claims 1, 8, and 20 (and all claims depending thereon) patentably distinguish over Helman, Neystadt, and Wootton.

Similarly, the Alperovitch, Schmidt, MSDN, and Wysopal references cited in the rejections of Claims 8-13 and 17-20 likewise fail to cure the deficiencies of Helman, Neystadt and Wootton.

Accordingly, Applicants respectfully request that the rejections under 35 U.S.C. § 103(a) be withdrawn.

Consequently, in view of the present amendment, and in light of the above discussion, the pending claims as presented herewith are believed to be in condition for

---

[3] See paragraph [0146] of Wootton.
[4] See paragraphs [0132] and [0234] of Wootton.

formal allowance, and an early and favorable action to that effect is respectfully requested.

If the Examiner believes, for any reason, that personal communication will expedite prosecution of this application, the Examiner is invited to telephone the undersigned at the number provided.

If additional fees are required for any reason, please charge Deposit Account No. 02-4800 the necessary amount.

Respectfully submitted,

BUCHANAN INGERSOLL & ROONEY PC

Date: April 14, 2014

By: [signature]
Derek P. Benke
Registration No. 56,944

**Customer No. 21839**
703-836-6620